[No. A016034. First Dist., Div. Four. Sept. 27, 1985.]

ELIZABETH KEARL, a Minor, etc., et al.,
Plaintiffs and Respondents, v.
LEDERLE LABORATORIES, Defendant and Appellant.

**COUNSEL**

W. W. Gudmundson, Richard J. Siggins, William S. Ginsburg, Raymond L. Morocco, Gudmundson, Siggins & Stone and Gudmundson, Siggins, Stone & Skinner for Defendant and Appellant.

Skadden, Arps, Slate, Meagher & Flom, Hughes, Hubbard & Reed, Malcolm E. Wheeler, Bruce J. Brennan and Geoffrey R. W. Smith as Amici Curiae on behalf of Defendant and Appellant.

Eugene E. White, White & White, Gary L. Randall and Michael C. Scranton for Plaintiffs and Respondents.

## Opinion

**SABRAW, J.**—Defendant, Lederle Laboratories, appeals from a judgment for plaintiff after a jury determined defendant's polio vaccine was defective and caused plaintiff to contract that disease. We reverse the judgment.

Although defendant raises numerous grounds for reversal—erroneous evidentiary rulings, misconduct on the part of the trial judge, inconsistency of verdicts, denial of due process, and erroneous application of strict products liability law to the facts of this case—we need address only the latter issue here. ■ We hold that although in standard products liability litigation a plaintiff may utilize a strict liability *design defect* theory, such a strict liability cause of action must be prohibited for public policy reasons if the court determines, after taking evidence, that the product complained of is "unavoidably dangerous"; in such special cases, a plaintiff may proceed on a design defect theory only on the basis of negligence. Furthermore, we will explain that although unavoidably dangerous products—like all other products—are subject to strict liability for *manufacturing defects*, such products are subject merely to negligence liability for *warning defects*.

### I. Background and Procedure

In the early 1950's polio was a crippler of many in this country and throughout the world. In the same decade Dr. Jonas Salk developed an injected killed polio virus vaccine. The virus was grown in a tissue culture and chemically "killed" to make it incapable of causing the disease, but able to act as an antigen to stimulate production of antibodies and thus repel any wild polio virus that entered the body. (Comment, *Mass Immunization Cases: Drug Manufacturers' Liability for Failure to Warn* (1976) 29 Vand.L.Rev. 235, 237.) Later in the decade Dr. Albert Sabin developed an oral vaccine consisting of living (but attenuated or "weakened") polio virus. The attenuated virus particles are generally incapable of causing the disease itself, but are strong enough to produce antibodies to repel wild polio virus and confer lifetime immunity. (*Id.*, at p. 238.) At trial and in the briefs, these two discoveries are referred to as the "Salk" and "Sabin" vaccines. As defendant points out, however, neither vaccine retains the exact formulation it contained when first introduced by its respective inventor. We will thus refer to the two vaccines by their current generic terms: injected "killed" polio vaccine (IPV) (i.e., Salk) and oral "live" polio vaccine (OPV) (i.e., Sabin).

In the early 1960's this country's public health officials selected OPV over IPV as the vaccine of choice for mass immunization. (Franklin & Mais, *Tort Law and Mass Immunization Programs: Lessons from the Polio and*

*Flu Episodes* (1977) 65 Cal.L.Rev. 754, 765.) OPV was preferred because it would: (1) be more acceptable to the public since it could be taken orally rather than by injection; (2) produce lifetime immunity in most persons without need for periodic booster shots as required by IPV; (3) prevent an immunized person from being a "carrier" of the disease, in contrast to the mere systemic immunity conferred by IPV; and (4) better eradicate wild polio virus from the environment because unlike IPV, OPV suppresses the wild virus from the intestinal tract. (Boffey, *Polio: Salk Challenges Safety of Sabin's Live-Virus Vaccine* (April 1977) 196 Science 35.) Soon thereafter, OPV associated cases of polio began to be reported. (J. Paul (1971) A History of Poliomyelitis 465.) In 1964, a Public Health Service special advisory committee report concluded that some cases of polio were in fact caused by the OPV vaccine, but emphasized the need to continue mass immunization at full speed. (Comment, *supra,* 29 Vand.L.Rev. at pp. 239-240, citing Special Advisory Committee on Oral Poliomyelitis Vaccine, Rep. to the Surgeon General of the Public Health Service (1964) at pp. 5-6.)

OPV has remained the vaccine of choice for more than two decades. As defendant observes, it continues to be recommended over IPV by, inter alia, the United States Public Health Service Advisory Committee on Immunization Practice, the Public Health Service Centers for Disease Control and the California State Public Health Service. It is also the vaccine of choice for every concerned medical advisory organization in the United States, including the Committee on Infectious Diseases of the American Academy of Pediatrics and the National Academy of Science. Moreover, the choice of OPV over IPV has been subject to periodic reconsideration. For example, after reviewing available information in 1977, the Institute of Medicine, National Academy of Sciences, recommended that OPV continue to be the principal vaccine against polio. During the same time IPV has been used only sporadically in this country, and is currently not made in the United States,[1] although it is still available here.

In November 1978 a physician advised Mrs. Kearl that her four-month-old daughter, Elizabeth, should be vaccinated. About two weeks later she took Elizabeth to a Contra Costa County clinic where she read a one page warning entitled "IMPORTANT INFORMATION ABOUT POLIO AND POLIO VAC-

---

[1]Until recently, IPV has been used exclusively—and, apparently, with success—in Finland and Sweden. (Franklin & Mais, *supra,* 65 Cal.L.Rev. at p. 768, fn. 55.) From late October 1984 to early January 1985, however, five persons in Finland contracted polio, two of whom had previously received five dosages of IPV. Finland has since ceased sole reliance on IPV, and vaccination of the entire population with OPV is set to begin soon. (Centers for Disease Control, United States Department of Health and Human Services, 34 Morbidity and Mortality Weekly Rep. No. 1 (Jan. 11, 1985) at p. 5.)

CINE. *Please read this carefully.*" The information sheet briefly described polio, stated that the risk of contracting it is very low "[e]ven for someone who is not vaccinated," and explained inter alia that oral live polio vaccine is "*one* of the best ways to prevent polio" in young children. (Italics added.) It provided: "POSSIBLE SIDE EFFECTS FROM THE VACCINE: Oral live polio vaccine rarely produces side effects. *However, once in about every 4 million vaccinations, persons who have been vaccinated or who come in close contact with those who have recently been vaccinated are permanently crippled and may die. Even though these risks are very low, they should be recognized. The risk of side effects from the vaccine must be balanced against the risk of the disease, both now and in the future.*" (Italics added.) The information sheet suggested that pregnant women should consult a physician before taking the vaccine, and listed other persons who should not take the vaccine without consulting a doctor.[2] It then informed the prospective vaccinee of the alternative vaccine: "NOTE ON INJECTABLE (KILLED) POLIO VACCINE: Besides the oral polio vaccine, there is also a killed polio vaccine given by injection which protects against polio after several shots. *It has no known risk of causing paralysis.* Most polio experts do not feel it is as effective as the oral vaccine for controlling polio in the United States. It is recommended for persons needing polio vaccination who have low resistance to infections (or those who live with them) and for unprotected adults traveling to a place where polio is common. It is not widely used in this country at the present time, but it is available. If you would like to know more about this type of polio vaccine, please ask us." (Italics added.)

The information sheet concluded: "QUESTIONS: If you have any questions about polio or polio vaccination, please ask us now or call your doctor or health department before you sign this form," and cautioned the reader to report any adverse reactions occurring within four weeks of taking the vaccine. Mrs. Kearl later testified she understood from the warning that there was a slight chance her daughter would get polio from the vaccine, and consciously considered that risk when she signed a consent form[3] and allowed her child to be vaccinated.

---

[2]"WARNING—SOME PERSONS SHOULD *Not* TAKE ORAL POLIO VACCINE WITHOUT CHECKING WITH A DOCTOR:
—Those with cancer or leukemia or lymphoma.
—Those with diseases that lower the body's resistance to infection.
—Those taking drugs that lower the body's resistance to infection, such as cortisone.
—Those who live in the same household with any of the above persons.
—Those who are sick right now with something more serious than a cold.
—Because adults have a slightly bigger risk of developing paralysis from the oral vaccine than children, persons over 18 should not take oral polio vaccine before checking with a doctor." (Italics added.)

[3]The consent form provided: "*I have read the information on this form about polio and the oral vaccine. I have had a chance to ask questions which were answered to my satisfac-*

About four weeks after the vaccination Elizabeth began to develop paralysis. Plaintiff sued both defendant and Contra Costa County and at trial— over defendant's objection—was allowed to put on strict products liability design defect evidence. Dr. Lawrence Steinman testified for plaintiff that OPV is defective in design because (i) contrary to the ordinary consumer's expectations it can cause polio, and because (ii) IPV is superior to OPV. Dr. Steinman also testified that the warning quoted above is inadequate because it fails to state that "OPV is the best way to get polio."

Although the trial court allowed Dr. Steinman's strict products liability design defect testimony over defendant's objections, when it came time to cross-examine plaintiff's expert the court apparently reconsidered and thought better of allowing such evidence. It informed defendant that comparisons of the two vaccines would not be allowed and that no further evidence on that theory would be taken—even as rebuttal to, or impeachment of, Dr. Steinman's design defect testimony. The court, however, refused defendant's requests to admonish the jury not to consider such design defect evidence, and to exclude further testimony on that theory of defect. Similarly, when defendant attempted to introduce evidence to rebut Dr. Steinman's testimony that the predominant cause of polio in 1978 was OPV, the court routinely barred such proof as irrelevant.

Defendant suffered other seemingly erroneous evidentiary rulings during presentation of its case. It had planned as part of its defense to offer the testimony of three witnesses to show the depth of study that preceded the national recommendation of OPV, the formulation of the warning given in this case, and to show that OPV was made to be as safe as was possible, under the state of scientific knowledge when it was marketed. On plaintiff's motion the court excluded such evidence as irrelevant, and stated its intention to restrict defendant to showing that OPV does not involve any risk of contracting polio. Faced with this, defendant reluctantly agreed to plaintiff's offer to stipulate to the proposed testimony of the three witnesses. The court admitted the stipulated testimony with equal reluctance, prefacing its introduction by telling the jury that what they were about to hear was irrelevant.

The jury was eventually instructed—again over defendant's vehement protestations—on the theory of design defect as articulated in *Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1]. The court modified B.A.J.I. No. 9.00.5 by substituting "medical" for "mechanical": "The manufacturer and/or distributor of a product is liable for injuries a legal cause of which was a defect in its design

---

*tion. I believe I understand the benefits and risks of oral polio vaccine and request that it be given to me or the person below for whom I am authorized to make this request."* (Italics in original.)

which existed when it left possession of such a defendant provided that the injury resulted from a use of the product that was reasonably foreseeable by the defendant. [¶] A product is defective in design unless the benefits of the design of the product as a whole outweigh the risk of danger inherent in the design or if the product failed to perform as safely as an ordinary consumer of the product would expect when used in a manner reasonably foreseeable by the defendant. [¶] In determining whether the benefits of the design outweigh such risks you may consider, among other things, the gravity of the danger posed by the design, the likelihood that such danger would cause damage, the *medical* feasibility of a safer alternate design at the time of manufacture, the financial cost of an improved design, and the adverse consequences to the product and the consumer that would result from an alternate design." (Italics added.) This modified instruction was later repeated, at the jury's request, after it had begun its deliberations. When that request came in again the next day the court, on its own motion and over defendant's objection, ordered it typed and sent to the jury room. This was the only typed instruction given to the jury.

The jury found nine-to-three that defendant was liable and codefendant Contra Costa County was not, and fixed damages at $800,000. The trial court denied defendant's motions for judgment notwithstanding the verdict and for a new trial. After briefs were filed in this appeal we requested that both parties submit supplemental briefs on the strict liability issue, and allowed amicus curiae to participate as well.

## II. Application of Strict Products Liability

Plaintiff's strict products liability theory at trial was that defendant's OPV was defective—not in its *manufacturing,* but in its *design* and in its accompanying *warning.* We address these issues in order.

### A. *Design Defect*

#### 1. *Background*

Over two decades ago Justice Traynor set in motion a nationwide trend toward strict products liability: "[a] manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." (*Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]; see also *Escola* v. *Coca Cola Bottling Co.* (1944) 24 Cal.2d 453, 461-468 [150 P.2d 436] (Traynor, J., conc.).)

Strict products liability differs from negligence in one key respect: it obviates the need for a plaintiff to show a manufacturer knew or should have known of the risk posed by his product—i.e., whether the manufacturer acted reasonably. Strict products liability focuses instead on whether the product is defective,[4] and in effect imputes to the manufacturer knowledge—as of the time of trial—of any risk posed by his product. (*Barker* v. *Lull Engineering Co., supra,* 20 Cal.3d 413, 430.)

By its own terms, the *Greenman* strict products liability doctrine applies to both design and manufacturing defects. (*Id.,* at p. 64.) In *Cronin* v. *J.B.E. Olson Corp.* (1972) 8 Cal.3d 121 [104 Cal.Rptr. 433, 501 P.2d 1153], a manufacturing defect case, the court rejected the Restatement (Second) of Torts 402A view that strict products liability plaintiffs must prove (i) a defect that is (ii) unreasonably dangerous. Striking the "unreasonably dangerous" requirement as an unnecessary element that rang of negligence, the court held that mere showing of a *manufacturing* or *design* defect would trigger strict products liability analysis. (*Id.,* at pp. 129, 132-134.) The court subsequently defined design defect in *Barker* v. *Lull Engineering Co., supra,* 20 Cal.3d 413 in alternative terms, both of which are expressed in B.A.J.I. No. 9.00.5, quoted above. ■ Under the first test, a plaintiff may establish a design defect by showing the product failed to perform as safely as an ordinary consumer would expect. (*Id.,* at pp. 429-430, 432.) Under the second alternative test a plaintiff may establish a defect by showing the product's design proximately caused his injury; the burden then shifts to the defendant to establish that, viewed from information available at the time of trial, the benefits of the product's design outweigh the risks inherent in such a design in light of certain relevant factors. (*Id.,* at pp. 430-432.)[5]

2. *Propriety of a strict products liability design defect prosecution in the present case*

The prospect that a manufacturer might be subject to either of *Barker*'s two standards for determining existence of a design defect may cause delay in marketing of products while manufacturers conduct various safety tests; in some cases the prospect of such review and concomitant increased like-

---

[4]"Strict products liability" might therefore be more accurately described as strict product "defect" liability. (Schwartz, *Foreword: Understanding Products Liability* (1979) 67 Cal.L.Rev. 435, 441-442.)

[5]The court explained that "in evaluating the adequacy of a product's design . . . a jury may consider, among other relevant factors, the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design." (20 Cal.3d at p. 431.)

lihood of liability[6] may deter research, manufacturing and marketing altogether. (Note, *The Liability of Pharmaceutical Manufacturers for Unforeseen Adverse Drug Reactions* (1980) 48 Fordham L.Rev. 735, 752-759.) It is apparently assumed that such a result is socially beneficial in the vast majority of products cases: we are often willing to sacrifice speedier marketing of products, or we may be willing to sacrifice availability altogether, in return for greater accountability of manufacturers through imposition of strict liability.[7] Although this may be an appropriate trade off when we are considering designs of appliances, cars, hand tools, or food, it might not be appropriate with regard to some special products that are extremely beneficial to society and yet pose an inherent and substantial risk that is unavoidable at the time of distribution.

As observed in *Feldman* v. *Lederle Laboratories* (1983) 189 N.J.Super. 424 [460 A.2d 203], reversed on other grounds in *Feldman* v. *Lederle Laboratories* (1984) 97 N.J. 429 [479 A.2d 374], holding manufacturers of such products subject to strict liability design defect analysis "may encourage prolonged independent testing but may equally prolong suffering by denying [a] needed cure or delaying its use." (*Id.*, at p. 209; see also Note, *supra*, 48 Fordham L.Rev. at pp. 756-757 [discussing the "drug lag" phenomenon]; Reed & Watkins, *Product Liability Tort Reform: The Case for Federal Action* (1984) 63 Neb. L.Rev. 389, 448-449 [the prospect of strict liability may cause manufacturers to withhold needed vaccines].) Although the extent to which the threat of strict liability may inhibit availability has been questioned (Comment, *An Escape From Strict Liability: Pharmaceutical Manufacturers' Responsibility for Drug-Related Injuries Under Comment k to Section 402A of the Restatement (Second) of Torts* (1984) 23 Duq. L.Rev. 199, 215-218; *Finn* v. *G. D. Searle & Co.* (1984) 35 Cal.3d 691, 719 & fn. 12 [200 Cal.Rptr. 870, 677 P.2d 1147] (Bird, C. J., dissenting)), we agree with the *Feldman* court that the enhanced prospect of liability posed by strict liability analysis might, in some cases, substantially affect a product's availability. In addition to the problem of delayed release (or nonrelease) mentioned above, we can easily conceive of situations in which a

---

[6]It has been suggested, however, that in some situations strict liability design defect analysis would not increase a manufacturer's exposure to liability over that which he faces under negligence analysis. (Schwartz, *supra*, 67 Cal.L.Rev. at pp. 462-463, 482-488; see also Wildman & Farrell, *Strict Products Liability in California: An Ideological Overview* (1985) 19 U.S.F. L.Rev. 139.) Whether this will prove true in certain cases is quite unclear. For now, all manufacturers must assume they will come within *Barker*'s broad and currently untested scope.

[7]See, however, *ante,* footnote 6. The major reason for allowing a design defect claim in a typical strict products liability action is one of consumer protection: "[Strict liability] [d]esign defect claims protect the consumer's interest in not being exposed to a product posing risks which so outweigh its benefits that it should not continue to be marketed." (McClellan, *Strict Liability for Drug Induced Injuries: An Excursion Through the Maze of Products Liability, Negligence and Absolute Liability* (1978) 25 Wayne L.Rev. 1, 32.)

manufacturer's cost of insuring against strict liability for injuries resulting from product design would "place the cost of research development and eventual marketing of new [products] beyond that which manufacturers, especially smaller manufacturers, are willing to risk . . . ." (*Feldman, supra,* 460 A.2d at p. 209; see also Note, *supra,* 48 Fordham L.Rev. at pp. 757-758; Reed & Watkins, *supra,* 63 Neb. L.Rev. at pp. 434-435.) Nor is it difficult to imagine a situation in which insurers would be unwilling to underwrite such risks, or do so at a practical cost; the swine flu legislation, under which the federal government assumed responsibility for injuries resulting from, inter alia, strict liability for vaccine design defects, was enacted in response to this very problem. (See Franklin & Mais, *supra,* 65 Cal.L.Rev. 754, 769-770; Baynes, *Liability for Vaccine Related Injuries: Public Health Considerations and Some Reflections on the Swine Flu Experience* (1977) 21 St. Louis U.L.J. 44, 66.) Furthermore, we believe it likely that the increased cost of product production—resulting from increased insurance costs—might "place the price of necessary [products] outside the reach of those who most need them" (*Feldman, supra,* 460 A.2d at p. 209), or that the prospect of strict liability might cause manufacturers to remove some products from the market, or decline to develop them. (Rosenn, *Litigation Involving Manufacturers' Liability for Defective Medical Products: Judicial Perspectives* (1976) 2 Am.J.L. & Med. 245, 251; Baynes, *supra,* 21 St. Louis U.L.J. at p. 71; Reed & Watkins, *supra,* 63 Neb. L.Rev. at pp. 436-443; Vaccine Injury Compensation, Hearings Before the Subcommittee on Health and the Environment of the Committee on Energy and Commerce, House of Representatives, 98th Cong., 2d Sess. 55, 77, 122, 229, 266, 295 (1984); Polio Immunization Program, Hearings Before the Subcommittee of Health of the Committee on Labor and Public Welfare, United States Senate, 94th Cong., 2d Sess. 47-54 (1976).) In this latter respect, we question the effect on product availability of subjecting manufacturers of so-called "orphan drugs" (or similar products that affect only a small part of the population) to strict liability design defect analysis. (*Feldman, supra,* 460 A.2d at p. 209; see also Note, *supra,* 48 Fordham L.Rev. at pp. 758-759.)

All of this suggests that with regard to some special products the scale may tip away from enhanced accountability (i.e., strict liability analysis of design defect claims) and in favor of availability.[8] It follows that to facili-

---

[8]This was recently recognized and well expressed in a similar context in *Feldman v. Lederle Laboratories, supra,* 460 A.2d 203, reversed on other grounds in *Feldman v. Lederle Laboratories, supra,* 479 A.2d 374. *Feldman* was a strict products liability warning defect prosecution of a manufacturer of a tetracycline antibiotic, Declomycin. The issue was whether liability for failing to warn should be imposed even when the risk posed by the product was objectively unknowable—i.e., it could not be said the defendant had actual or constructive knowledge of the risk—at the time of marketing. The court recognized that in

tate, and not frustrate availability in those special cases, some special products should be exempted from the normal strict products liability design defect analysis; instead of judging such products in the light of ordinary consumer expectations or present scientific knowledge, they should be reviewed according to the state of the art—i.e., the manufacturer's actual or constructive knowledge—at the time of marketing. (Accord, Prosser, Law of Torts (4th ed. 1971) § 99, at p. 661.) As observed by the late Dean Prosser: "The argument that industries producing potentially dangerous products should make good the harm, distribute it by liability insurance, and add the cost to the price of the product, encounters reason for pause, when we consider that two of the greatest medical boons to the human race, penicillin and cortisone, both have their dangerous side effects, and that drug companies might well have been deterred from producing and selling them. [¶] Thus far the courts have tended to hold the manufacturer to a high standard of care in preparing and testing drugs of unknown potentiality and in giving warning; but in the absence of evidence that this standard has not been met, they have refused to hold the maker liable for the unforeseeable harm." (*Ibid.*, fns. omitted.) In other words, some special products should be analyzed for design defects under a negligence standard, rather than a strict liability standard.

Without articulating the above in quite the same way, for over two decades courts have almost universally reached the same conclusion, namely, that some special products should not be subjected to strict liability design defect analysis.

The rule has often been followed in prescription drug and vaccine cases. See *Toole* v. *Richardson-Merrell, Inc.* (1967) 251 Cal.App.2d 689, 708-711 [60 Cal.Rptr. 398, 29 A.L.R.3d 988] (manufacturer of MER/29, a drug prescribed to treat arteriosclerosis, can be held strictly liable only for manufacturing or warning defects); *Christofferson* v. *Kaiser Foundation Hospitals* (1971) 15 Cal.App.3d 75, 77-80 [92 Cal.Rptr. 825, 53 A.L.R.3d

---

the "ordinary" strict products liability case the dual consequences of enhanced accountability—cost spreading and increased safety—are properly accorded predominant sway over concerns for availability. The court observed that this is not the situation, however, "in cases involving a prescription drug which, as does Declomycin, serves a human need. . . . [A]lthough the imposition of . . . liability [regardless of whether the manufacturer actually or constructively knew of the risk posed by its product] may indeed create incentive in ordinary products cases 'to invest more actively in safety research,' in new drug situations the imposition of strict liability can have an effect which does not serve the general public welfare. 'It would cause drug companies to hesitate and prolong time before precious, beneficial and long-awaited drugs were put on the market.'" (*Id.*, at p. 205, quoting *Leibowitz* v. *Ortho Pharmaceutical Corp.* (1973) 224 Pa.Super. 418 [307 A.2d 449, 458].) This reasoning pertains equally to the question of whether the consumer expectations or hindsight approach of *Barker*'s strict products liability design defect analysis should apply to certain special products.

292] (trial court properly declined to instruct on strict liability design defect in prescription skin drug case; defendant can be liable for warning defects); *Carmichael* v. *Reitz* (1971) 17 Cal.App.3d 958, 988-989 [95 Cal.Rptr. 381] (manufacturer of Enovid, a prescription drug that treated endometriosis and assisted pregnancy, could be held strictly liable only for manufacturing or warning defects); *Lewis* v. *Baker* (1966) 243 Ore. 317 [413 P.2d 400, 404] (manufacturer of prescription drug MER/29 (see *Toole, supra*) can be held strictly liable only for manufacturing or labeling defects), overruled on other grounds in *McEwen* v. *Ortho Pharmaceutical Corporation* (1974) 270 Ore. 375 [528 P.2d 522, 534]; *Gaston* v. *Hunter* (App. 1978) 121 Ariz. 33 [588 P.2d 326, 338-341] (trial court properly refused to instruct on design defect regarding an experimental drug designed to treat back disk disease; plaintiff limited to showing manufacturing or warning defect); *Chambers* v. *G. D. Searle & Co.* (D.Md. 1975) 441 F.Supp. 377, 380-381 (oral contraceptive treated as unavoidably unsafe product; plaintiff is limited to showing manufacturing or warning defect), affd. (4th Cir. 1977) 567 F.2d 269; *DeLuryea* v. *Winthrop Laboratories, etc.* (8th Cir. 1983) 697 F.2d 222, 228-229 (pain-killing drug is an unavoidably unsafe product; negligence law, not strict liability law, governs such a case); *Reyes* v. *Wyeth Laboratories* (5th Cir. 1974) 498 F.2d 1264, 1273-1275 (Sabin-like oral live polio vaccine is an unavoidably dangerous product; it can be deemed defective only if it is improperly prepared or marketed without a proper warning); *Davis* v. *Wyeth Laboratories, Inc.* (9th Cir. 1968) 399 F.2d 121, 128-129 (same).[9] Even those who would impose yet "stricter" liability standards on prescription drug manufacturers recognize the need to exempt from such exacting scrutiny certain unavoidably dangerous products. (Comment, *Strict Liability in Tort: Its Applicability to Manufacturers of Prescription Drugs*

---

[9]Numerous other decisions recognize the same rule by implication. In the following cases, plaintiffs who sued for injuries from what were apparently deemed to be unavoidably dangerous products voluntarily limited their theories of recovery to warning defects: *Feldman* v. *Lederle Laboratories* (1984) 97 N.J. 429 [479 A.2d 374] (tetracycline prescription drug); *Sheehan* v. *Pima County* (App. 1982) 135 Ariz. 235 [660 P.2d 486] (Sabin-like oral live polio vaccine); *Dunn* v. *Lederle Laboratories* (1982) 121 Mich.App. 73 [328 N.W.2d 576, 579-580] (Sabin-like oral live polio vaccine is unavoidably dangerous); *Seley* v. *G. D. Searle & Co.* (1981) 67 Ohio St.2d 192 [21 Ohio Ops.3d 121, 423 N.E.2d 831] (oral contraceptive); *Woodill* v. *Parke Davis & Co.* (1980) 79 Ill.2d 26 [402 N.E.2d 194] (prescription drug used to induce uterine contractions); *Hamilton* v. *Hardy* (1976) 37 Colo.App. 375 [549 P.2d 1099] (oral contraceptive); *Cunningham* v. *Charles Pfizer & Co., Inc.* (Okla. 1974) 532 P.2d 1377, 1380-1381 [94 A.L.R.3d 739]; *Brooks* v. *Medtronic, Inc.* (4th Cir. 1984) 750 F.2d 1227 (mechanical pacemaker found to be an unavoidably unsafe product); *Petty* v. *United States* (8th Cir. 1984) 740 F.2d 1428 (swine flu vaccine); *Unthank* v. *United States* (10th Cir. 1984) 732 F.2d 1517 (swine flu vaccine); *Needham* v. *White Laboratories, Inc.* (7th Cir. 1981) 639 F.2d 394 (synthetic estrogen designed to prevent miscarriages); *Singer* v. *Sterling Drug, Inc.* (7th Cir. 1972) 461 F.2d 288 (skin disease prescription drug); *Basko* v. *Sterling Drug, Inc.* (2d Cir. 1969) 416 F.2d 417 (skin disease prescription drugs); *Williams* v. *Lederle Laboratories* (S.D. Ohio 1984) 591 F.Supp. 381 (Sabin-like oral live polio vaccine).

(1974) 7 U.C. Davis L.Rev. 487, 505-507; Chamberlain, *The Diminishing Role of Negligence in Manufacturers' Liability for Unavoidably Unsafe Drugs and Cosmetics* (1977) 9 St. Mary's L.J. 102, 114, 116.)

We are aware of only one reported decision which has sanctioned a strict products liability design defect recovery on a prescription drug. *Brochu* v. *Ortho Pharmaceutical Corp.* (1st Cir. 1981) 642 F.2d 652, concerned an oral contraceptive that contained 100 milligrams of estrogen. The evidence showed the estrogen posed a serious risk to plaintiff, that defendant made another contraceptive pill containing only 50 milligrams of estrogen, and that the additional estrogen was known and proved to have no effect on the efficacy of the product (*id.*, at p. 655). The court held that in this situation it was proper for the jury to have been instructed on a strict products liability design defect theory. (*Ibid.*) ■ As we shall explain below, this result is correct on these peculiar facts, because products—including prescription drugs—should not be exempt from strict liability design defect analysis if the evidence shows inter alia availability, at the time of distribution, of an alternative product that would have *as effectively* accomplished the *full intended purpose* of the subject product. (*Post*, at p. 830; accord, Comment, *Can a Prescription Drug be Defectively Designed?—Brochu* v. *Ortho Pharmaceutical Corp.* (1981) 31 De Paul L.Rev. 247, 259-268, 272.) We would also observe that under the *Brochu* facts plaintiff's recovery could have been made on a design defect theory based on negligence.

The only opinion embracing a strict products liability design defect theory while impliedly rejecting the unavoidably dangerous product rule is the dissent in *Finn* v. *G. D. Searle & Co.*, *supra*, 35 Cal.3d 691, 713-722. The Chief Justice (i) observed the trend since *Greenman* is toward expansion of strict liability (*id.*, at p. 716); (ii) rejected the notion that such expanded liability might chill drug research (*id.*, at pp. 718-719; but see *ante*, pp. 823-824; Note, *supra*, 48 Fordham L.Rev. at pp. 755-759); (iii) suggested that imposition of strict liability would result in safer drugs (35 Cal.3d at pp. 718-719; but see Rheingold, *Products Liability—The Ethical Drug Manufacturer's Liability* (1964) 18 Rutgers L.Rev. 947, 1015; Note, *supra*, 48 Fordham L.Rev. at pp. 753-755); and (iv) argued that drug manufacturers, like other manufacturers, are better able to absorb and spread costs (35 Cal.3d at pp. 717-718, 719; but see Note, *supra*, 48 Fordham L.Rev. at pp. 757-758; Reed & Watkins, *supra*, 63 Neb. L.Rev. at p. 448). In the process of reaching these policy conclusions, the dissent cited seven cases, none of which, however, support the proposition that a strict products liability design defect theory is proper in the case of a drug that may qualify for unavoidably dangerous product treatment.[10]

---

[10](35 Cal.3d at pp. 716-717.) The first case cited in the *Finn* dissent, *Brochu* v. *Ortho*

Although, as we have shown, the rule against subjecting some special products to strict liability design defect analysis is well established, its application has not often been well explained. Instead, the rule is frequently stated in conclusory fashion accompanied by little more than a reference or citation to Restatement Second of Torts section 402A, comment k, which sets out the basic rule.[11] Because comment k itself refers to prescription

---

*Pharmaceutical Corp., supra,* did hold an oral contraceptive manufacturer subject to strict products liability design defect analysis under the facts of that case: as explained above, the unavoidably dangerous product exemption could not properly be applied in *Brochu* because the court had before it evidence of an equally effective alternative drug (642 F.2d at p. 655). The next case cited in the dissent, *Reyes* v. *Wyeth Laboratories, supra,* 498 F.2d 1264, concluded that a Sabin-like oral live polio vaccine is an unavoidably dangerous product (*id.,* at p. 1273), strongly implied that a design defect prosecution would thus be improper, and focused almost exclusively on warning defects (*id.,* at pp. 1274-1278). The third case, *Parke-Davis & Company* v. *Stromsodt* (8th Cir. 1969) 411 F.2d 1390, was not a strict liability decision, but was based on implied warranty. The court did not consider the effect of the unavoidably dangerous products exemption on the drug in that case—a mixture of four vaccines. Furthermore, the *Parke-Davis* court affirmed a jury verdict for the plaintiff based on numerous theories—including negligence (*id.,* at pp. 1399-1402). The fourth case cited in the *Finn* dissent, *Grinnell* v. *Charles Pfizer & Co.* (1969) 274 Cal.App.2d 424 [79 Cal.Rptr. 369], involved a Sabin-like oral live polio vaccine. The court affirmed the jury's finding that the defendant had breached an express warranty (*id.,* at pp. 438-442) but implied that liability could alternatively be based on strict products liability for a design defect (*id.,* at pp. 432-438). In making this latter point, the court relied for authority on a manufacturing defect case, *Gottsdanker* v. *Cutter Laboratories* (1960) 182 Cal.App.2d 602 [6 Cal.Rptr. 320, 79 A.L.R.2d 290], and a warning defect case, *Toole* v. *Richardson-Merrell, Inc., supra,* 251 Cal.App.2d 689, 710-711. (274 Cal.App.2d at pp. 433-434.) To compound this confusion, the *Grinnell* court seemed to embrace the unavoidably dangerous product exemption as enunciated in *Toole, supra,* but declined to apply that rule because the issue was not raised at trial or on appeal (*id.,* at pp. 435-436, fn. 7). The fifth case cited, *Gottsdanker* v. *Cutter Laboratories, supra,* was not a design defect case, but a manufacturing defect case (182 Cal.App.2d at p. 605). The sixth case cited in the *Finn* dissent, *Hutchinson* v. *Revlon Corp.* (1967) 256 Cal.App.2d 517 [65 Cal.Rptr. 81], involved an over-the-counter drug— "Hi and Dri" deodorant—that would quite clearly not qualify for unavoidably dangerous product treatment; it is therefore unremarkable that the *Hutchinson* court concluded the plaintiff had a right to complete strict products liability instructions (*id.,* at p. 522). Finally, the seventh case, *Sindell* v. *Abbott Laboratories* (1980) 26 Cal.3d 588 [163 Cal.Rptr. 132, 607 P.2d 924, 2 A.L.R.4th 1061], involved the antimiscarriage drug diethylstilbestrol (DES). The plaintiffs in *Sindell* alleged, inter alia, that various defendants had marketed DES *without warning of dangers of which defendants were aware* (*id.,* at p. 594). The Supreme Court said nothing of plaintiffs' ability to put on a strict products liability design defect case, but focused instead on the adequacy of plaintiffs' pleadings, and held that under certain circumstances the burden of proof would shift to the defendants to demonstrate that they could not have made the product that injured the plaintiffs (*id.,* at pp. 610-613).

[11]Comment k provides: "*Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians,

drugs and vaccines as examples of products that are "unavoidably unsafe" and hence not "unreasonably dangerous" as long as they are properly manufactured and a proper warning is given, defendant suggests we need inquire no further before we brand the design defect evidence and instruction here as error. We prefer, however, to proceed with more caution before we confer such special protection on a product.

Although we agree in principle with the unavoidably dangerous products exemption—i.e., we agree that some special highly beneficial and yet inherently risky products may be deemed unavoidably dangerous and hence exempt from strict products liability design defect analysis as a matter of law—we are uncomfortable with the rather routine and mechanical fashion by which many appellate courts have concluded that certain products, particularly drugs, are entitled to such special treatment. Indeed, "[t]he statement that drugs are unavoidably [dangerous], and therefore within the protection of Comment k, has become almost tautological." (Comment, *supra,* 31 De Paul L.Rev. at 254.)

In our view, the decision as to whether a drug, vaccine, or any other product triggers unavoidably dangerous product exemption from strict liability design defect analysis poses a mixed question of law and fact and can be made only after evidence is first taken, out of the jury's presence, on the relevant factors to be considered. (*Accord, Feldman* v. *Lederle Laboratories, supra,* 479 A.2d 374, 383;[12] see also Chamberlain, *supra,* 9 St. Mary's L.J. at pp. 114, 116-117.) A trial court should take evidence as to: (1) whether, when distributed,[13] the product was intended to confer

---

or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk." (Italics in original.)

[12]The New Jersey Supreme Court observed, "we see no reason to hold as a matter of law and policy that all prescription drugs that are unsafe are unavoidably so. Drugs, like any other products, may contain defects that could have been avoided by better manufacturing or design. Whether a drug is unavoidably unsafe should be decided on a case-by-case basis; we perceive no justification for giving all prescription drug manufacturers a blanket immunity from strict liability manufacturing and design defect claims under comment k." (*Ibid.*) See *post,* footnote 15 and accompanying text, regarding the *Feldman* court's suggestion that the unavoidably dangerous product doctrine would exempt products from strict liability manufacturing defect analysis.

[13]Wade, *On the Effect in Product Liability of Knowledge Unavailable Prior to Marketing* (1983) 58 N.Y.U.L.Rev. 734, 753-754 (time of distribution or marketing is when the manufacturer relinquishes control of the product).

an exceptionally important benefit that made its availability highly desirable; (2) whether the then-existing risk posed by the product was both "substantial" and "unavoidable"; and (3) whether the interest in availability (again measured as of the time of distribution) outweighs the interest in promoting enhanced accountability through strict liability design defect review. In determining the first aspect of the second factor (i.e., whether the risk posed was "substantial"), a court should consider whether, at the time of distribution, the risk posed permanent or long-term disability (e.g., loss of body functions, organs, or death) as opposed to mere temporary or insignificant inconvenience (e.g., skin rash, minor allergic reaction, etc.). In determining the second aspect of the second factor (i.e., whether the risk posed was "unavoidable"), a court should consider (i) whether the product was designed to minimize—to the extent scientifically knowable at the time it was distributed—the risk inherent in the product, and (ii) the availability—again, at the time of distribution—of any alternative product that would have *as effectively* accomplished the *full intended purpose* of the subject product. For example, if, as the evidence in this case already suggests, IPV would have given only systemic immunity to the vaccinee, a court could conclude that IPV would not have as effectively accomplished the full intended purpose of the subject product; in that case, the availability of IPV would not preclude a finding that OPV is unavoidably dangerous.[14]

If the court concludes after taking such evidence that (1) the product was intended to provide an exceptionally important benefit that made its availability highly desirable, (2) the risk posed by the product was substantial and unavoidable when distributed, and (3) the interest in availability, measured as of the time of distribution, outweighs the interest in promoting enhanced accountability, the product will be deemed unavoidably dangerous and exempted from strict products liability design defect analysis. Of course, the trial court's conclusion of law based on such findings may then be reviewed by an appellate court; it is not our proper role, however, to assume or take judicial notice of facts sufficient to support such a finding.

Nevertheless, given the opportunity, defendant would likely be able to produce evidence to attempt to support a conclusion that its OPV is an unavoidably dangerous product, and hence is exempt from strict products liability design defect analysis as a matter of law. ■ Accordingly, it was error for the trial court to have permitted the jury to hear strict liability design defect evidence and to have instructed on a *Barker* v. *Lull* design

---

[14](See *ante,* fn. 1 [discussing Finland's decision to vaccinate with OPV in light of a recent polio outbreak involving IPV-vaccinated persons]; Boffey, *supra,* 196 Science at p. 36 [questioning whether IPV would be as effective as OPV in this country]; see generally Chamberlain, *supra,* 9 St. Mary's L.J. at pp. 113-114.)

defect theory without having first taken evidence to determine whether the unavoidably dangerous product exemption applies here.

■ The above analysis pertains, of course, only to plaintiff's strict products liability design defect theory. Even if the OPV in this case had been properly determined to be an unavoidably dangerous product, however, such a finding would not have precluded plaintiff from prosecuting her case on the theory of strict products liability for manufacturing defects.[15] Plaintiff did not do so, but instead based her second theory of liability on an allegedly inadequate warning.

### B. *Warning Defect*

#### 1. *Background*

■ Professor Wade has stated that "[a] warning can prevent a product from being characterized as unreasonably dangerous [i.e., defective] in two types of situations: (1) the product produces a danger that can be avoided by the user if he is alerted to it and instructed how to avoid it, and (2) the product creates a danger that cannot be eliminated, but its utility is so great that it may be marketed without subjecting the manufacturer to liability, provided the user is made aware of the danger and is given the opportunity to make an informed decision whether to expose himself to it." (Wade, *supra,* 58 N.Y.U.L.Rev. at p. 745; see also Twerski et al., *The Use and Abuse of Warnings in Products Liability—Design Defect Litigation Comes of Age* (1976) 61 Cornell L.Rev. 495, 517-521.) In the present case we are concerned with the second type of warning.

■ As an initial matter we question the commonly assumed and often asserted proposition that in products liability cases failure to warn or inad-

---

[15]Thus it is incorrect to suggest, as have some courts (e.g., *Feldman* v. *Lederle Laboratories, supra,* 479 A.2d 374, 383; *Payton* v. *Abbott Labs* (1982) 386 Mass. 540 [437 N.E.2d 171, 189]; *Gaston* v. *Hunter, supra,* 588 P.2d 326, 339), that once a product is deemed unavoidably dangerous there can be no strict liability, only negligence liability. Nor do we agree with the suggestion in *Leibowitz* v. *Ortho Pharmaceutical Corp., supra,* 307 A.2d 449, 458, that once a product is deemed unavoidably dangerous it is also deemed free from design defects as a matter of law. As we have explained, the unavoidably dangerous product doctrine merely exempts the product from a strict liability design defect analysis; a plaintiff remains free to pursue his design defect theory on the basis of negligence.

Similarly, it would be incorrect to view an unavoidably dangerous product as subject to strict products liability design defect analysis, or as presumptively defective, simply because such a product may lack a warning. (See, e.g., *Needham* v. *White Laboratories, Inc., supra,* 639 F.2d 394, 402; Franklin & Mais, *supra,* 65 Cal.L.Rev. at p. 756 (characterizing *Reyes* v. *Wyeth Laboratories, supra,* 498 F.2d 1264); McClellan et al., *Strict Liability for Prescription Drug Injuries: The Improper Marketing Theory* (1981) 26 St. Louis U.L.J. 1, 28.) As we explain below, the test for whether a warning must be given is one of reasonableness; because there may be unavoidably dangerous products that reasonably require no warning, such products would not be defective by mere absence of warning.

equacy of a warning may be a basis for imposition of *strict liability*. A review of the cases discloses that the analysis called for in this situation is not based on strict liability, but negligence.

As noted above (*ante*, p. 822) the characteristic that distinguishes strict liability from negligence is proof of actual or constructive knowledge of risk: In a negligence action we focus on the defendant's conduct and require plaintiff to show defendant acted unreasonably in light of a known or constructively known risk. In strict liability actions, on the other hand, we focus not on the reasonableness of a defendant's conduct but on the product, and we either ignore the question of a manufacturer's actual or constructive knowledge of risk (as in a "consumer expectations" design defect case) or we in effect impute to the manufacturer defendant current scientific knowledge of the risk caused by his product (as in a risk/benefit design defect balancing case). (See, e.g., Comment, *The Failure to Warn Defect: Strict Liability of the Prescription Drug Manufacturer in California* (1983) 17 U.S.F. L.Rev. 743, 755.) But in all warning cases—even if the plaintiff or the court claims to analyze failure to warn or inadequacy of warning in the context of a strict products liability claim—the tests actually applied condition imposition of liability on the defendant's having actually or constructively known of the risk that triggers the warning. (E.g., *Carmichael* v. *Reitz, supra,* 17 Cal.App.3d 958, 988; *Christofferson* v. *Kaiser Foundation Hospitals, supra,* 15 Cal.App.3d 75, 79-80; *Oakes* v. *E.I. Du Pont de Nemours & Co., Inc.* (1969) 272 Cal.App.2d 645, 650-651 [77 Cal.Rptr. 709]; *Toole* v. *Richardson-Merrell, Inc., supra,* 251 Cal.App.2d 689, 709-710; *Dunn* v. *Lederle Laboratories, supra,* 328 N.W.2d 576, 580; *Woodill* v. *Parke Davis & Co., supra,* 402 N.E.2d 194, 197-198, and cases cited; *Petty* v. *United States, supra,* 740 F.2d 1428, 1432; *Reyes* v. *Wyeth Laboratories, supra,* 498 F.2d 1264, 1274-1275; *Basko* v. *Sterling Drug, Inc., supra,* 416 F.2d 417, 426; *Sterling Drug, Inc.* v. *Yarrow* (8th Cir. 1969) 408 F.2d 978, 992-993; *Davis* v. *Wyeth Laboratories, supra,* 399 F.2d 121, 129; Kidwell, *The Duty to Warn: A Description of the Model of Decision* (1975) 53 Tex. L.Rev. 1375, 1377-1378; Note, *supra,* 48 Fordham L.Rev. at pp. 745-750; Prosser & Keeton on Torts (5th ed. 1984) § 99, at p. 697; see also Comment, *Strict Liability and the Tortious Failure to Warn* (1984) 11 N. Ky. L.Rev. 409, 419-422 [criticizing but recognizing the present result].)[16]

---

[16]The contrary and minority rule, advocated by the Chief Justice in her dissent in *Finn* v. *G. D. Searle & Co., supra,* 35 Cal.3d 691, 723-724 (see also Comment, *supra,* 17 U.S.F.L.Rev. 743; Comment, *supra,* 23 Duq. L.Rev. 199), was recently stated in *Beshada* v. *Johns-Manville Products Corp.* (1982) 90 N.J. 191 [447 A.2d 539, 33 A.L.R.4th 353]. *Beshada* was immediately subjected to intense scholarly criticism (e.g., Page, *Generic Product Risks: The Case Against Comment k and for Strict Tort Liability* (1983) 58 N.Y.U.L.Rev. 853, 877-882; Schwartz, *The Post-Sale Duty to Warn: Two Unfortunate Forks in the Road*

Just as liability for failure to warn of product risk is based on negligence, the adequacy of a warning is also judged under a reasonableness standard—even if the claim is made under the rubric of a strict products liability "defect." *(Sterling Drug, Inc.* v. *Yarrow, supra,* 408 F.2d 978, 992-993; *Feldman* v. *Lederle Laboratories, supra,* 479 A.2d 374, 386 ["negligence and strict liability in warning cases may be deemed to be functional equivalents"]; *Dunn* v. *Lederle Laboratories, supra,* 328 N.W.2d 576, 580; Franklin & Mais, *supra,* 65 Cal.L.Rev. at p. 762, and cases cited in fn. 33; Note, *supra,* 32 De Paul L.Rev. at p. 254, fn. 29; Kidwell, *supra,* 53 Tex. L.Rev. at pp. 1378-1379; Prosser & Keeton, *supra,* § 99, at p. 697; but see Noel, *Products Defective Because of Inadequate Directions or Warnings* (1969) 23 Sw. L.J. 256, 267-272.)[17] ■ As recent federal court of appeals decisions have held, an adequate warning in mass inoculation cases (as distinguished from other products or prescription drug cases) requires that vaccinees be directly informed in clear and simple terms by the drug manufacturer[18] of (1) the reasonably foreseeable risk inherent in the product; (2) reasonably available alternative products and the reason-

---

*to a Reasonable Doctrine* (1983) 58 N.Y.U.L.Rev. 892, 901-905; Wade, *supra,* 58 N.Y.U.L.Rev. at pp. 754-756; Comment, *Requiring Omniscience: The Duty to Warn of Scientifically Undiscoverable Product Defects* (1983) 71 Geo.L.J. 1635; Comment, *Beshada* v. *Johns Manville Products Corp.: Adding Uncertainty to Injury* (1983) 35 Rutgers L.Rev. 982), and was effectively and unanimously overruled by the same court two years later in a prescription drug case. *(Feldman* v. *Lederle Laboratories, supra,* 479 A.2d 374, 387-388.)

[17]This is true despite the fact that in some cases it may be helpful for the trial court to instruct the jury to consider particular factors in determining the reasonable need for, or adequacy of, a warning. Thus in *Cavers* v. *Cushman Motor Sales, Inc.* (1979) 95 Cal.App.3d 338 [157 Cal.Rptr. 142], the court stated that "[i]n assisting the [jurors'] determination of whether the absence of a warning makes a product defective, the trial court should focus their attention on such relevant considerations as the normal expectations of the consumer as to how the product will perform, degrees of simplicity or complication in the operation or use of the product, the nature and magnitude of danger to which the user is exposed, the likelihood of injury, and the feasibility and beneficial effect of including a warning." *(Id.,* at pp. 347-348.) Contrary to dicta in *Finn* v. *G. D. Searle & Co., supra,* 35 Cal.3d 691, 700, 702, and the *Finn* dissent's suggestion at page 724, nothing in *Cavers* suggests, nor was it intended to imply, that failure to warn can or should be subject to an analysis different from negligence simply because it happens to be alleged as a basis of a product defect. *Cavers* simply attempts to give the jury guidance in determining the reasonableness of a warning or the reasonable need for a warning in a typical products liability case.

[18]Defendant maintains that because OPV is technically a prescription drug, and because plaintiff consulted a doctor about two weeks before consenting to the vaccine, it had no duty to warn any vaccinee directly. Although this is the law with regard to most prescription drugs (see *Carmichael* v. *Reitz, supra,* 17 Cal.App.3d 958, 989; but see *MacDonald* v. *Ortho Pharmaceutical Corp.* (1985) 394 Mass. 131 [475 N.E.2d 65, 68] [manufacturer's duty to warn consumer regarding dangers posed by oral contraceptive]), this rule is not followed in cases such as this, in which the drug is dispensed at a clinic without close supervision by a prescribing physician. *(Reyes* v. *Wyeth Laboratories, supra,* 498 F.2d 1264, 1275-1278; *Cunningham* v. *Charles Pfizer & Co., supra,* 532 P.2d 1377, 1381; *Petty* v. *United States, supra,* 740 F.2d 1428, 1439-1440; Comment, *Pharmaceutical Manufacturers and Consumer-Directed Information—Enhancing the Safety of Prescription Drug Use* (1984) 34 Cath. U.L.Rev. 117, 122-137.)

ably foreseeable risks posed by such alternatives; and perhaps—in appropriate cases—(3) the reasonably foreseeable results of remaining untreated. (*Petty* v. *United States, supra,* 740 F.2d 1428, 1436, 1437 [adequacy of swine flu vaccine warnings]; *Unthank* v. *United States, supra,* 732 F.2d 1517, 1521 [same]; Comment, *Informed Consent to Immunization: The Risks and Benefits of Individual Autonomy* (1977) 65 Cal.L.Rev. 1286, 1295-1299, 1307-1311; see also *Cobbs* v. *Grant* (1972) 8 Cal.3d 229, 241-245 [104 Cal.Rptr. 505, 502 P.2d 1]; cf., Britain, *Product Honesty is the Best Policy: A Comparison of Doctors' and Manufacturers' Duty to Disclose Drug Risks and the Importance of Consumer Expectations in Determining Product Defect* (1984) 79 Nw.U.L.Rev. 342.)

### 2. *Adequacy of the warning*

 As related above defendant directly warned plaintiff in plain and explicit terms about the risk of contracting polio from the vaccine. It described the alternative vaccine, IPV, and stated that vaccine carried no risk of causing polio, that it was available, and that most polio experts feel it is not as effective as OPV in controlling polio nationwide—an objective statement of fact clearly borne out by the literature. The reader was specifically invited to inquire further about IPV and was generally invited to ask questions about polio and polio vaccination. We conclude this warning adequately informed plaintiff of the reasonably foreseeable risks associated with OPV and with the alternative product, IPV.

Plaintiff nevertheless contends, as she did at trial, that the warning was inadequate because it failed to inform her that OPV "is the best way to get polio today." We infer from her supplemental brief, however, that she would now "revise" her proposed warning to state that the risk of contracting polio was "roughly the same" whether or not she took defendant's OPV.[19] In either event, she argues, had she been so informed she would

---

[19]The court admitted in evidence a booklet, Centers for Disease Control, Poliomyelitis Surveillance Summary 1977-1978 (Dec. 1980), United States Department of Health and Human Services. This document shows that between 1969 and 1978 there were 165 cases of polio nationwide, of which 76—or 46 percent—were vaccine-related. States bordering Mexico, a poorly vaccinated country, experienced an even higher proportion of nonvaccine related cases in those years: Texas had 40 cases, 36 of which were nonvaccine related; New Mexico's two cases were nonvaccine related; of Arizona's two cases, one was nonvaccine related; and California had 16 cases, 12 of which were not related to vaccine. Plaintiff, however, argues for the first time on appeal that at least the Texas figures should have been excluded, and that so viewed, over 57 percent of the polio cases in the United States between 1969-1978 were vaccine-related. Apparently agreeing with this, two of defendant's own witnesses testified on cross-examination that the nationwide risk of contracting polio from OPV is greater than the risk of contracting it from the wild virus, and suggested that a significant number of nonvaccine-related polio cases were imported from Mexico rather than related to the wild endemic virus. In her supplemental brief, however, plaintiff again reviews

not have taken the vaccine.[20] But even assuming that at the time of plaintiff's vaccination there was a slightly higher risk of contracting polio through OPV compared to contracting wild polio virus, the warning was not inadequate for failing to so state.

██    Whatever the statistical probabilities were, the evidence discloses that they were very close and that the chance of contracting polio from either course was very remote. (*Ante,* fns. 19, 20.) Under plaintiff's theory, defendant would have to undertake constant studies of the two statistical probabilities and furnish warnings according to the fluctuating statistical results. Once a sufficient number of persons had received the warning proposed by plaintiff—and assuming they would act as plaintiff claims they should, and decline the vaccine—the statistical chance of contracting polio through the wild virus would rise slightly, surpassing the nonuse statistic. Assuming these probabilities are measurable with a sufficient degree of accuracy—a proposition itself very much in doubt—such vacillations would continue indefinitely while the manufacturer would be forced to modify the warning in response to changing statistics. Thus even assuming the warning proposed at trial would have been true in 1978, it might or might not have been true in 1979, and it eventually would have been false sometime thereafter. This would be even more obviously so regarding plaintiff's "revised" warning. We conclude that whatever duty a manufacturer may have to inform of risks associated with nonuse of a product, such a duty most certainly cannot be imposed when the relationship between use and nonuse is statistically close (and quite possibly immeasurable) and the probability of injury from either course is extremely remote.[21]

The decision we announce today is compelled by the current state of the law. We are aware that as a result, other unfortunate plaintiffs like Elizabeth Kearl—unless they can establish liability consistently with the rules set out here—may unfairly bear the burden of society's interest in promoting avail-

---

these figures and admits (i) the chance of contracting polio from the vaccine is less than from the wild virus, (ii) "the statistical difference between the two [courses] is so minute as to be practically nonexistent," and (iii) the chances of contracting polio from either course "are very similar."

[20]Plaintiff was informed that "[e]ven for someone who is not vaccinated, the risk [of contracting polio] is very low."

[21]We therefore need not address whether defendant's warning of the risks associated with nonuse (*ante,* fn. 20) was adequate.

Nor need we address the even more difficult question of whether, in circumstances such as these, a vaccine recipient's interest in being fully informed of the comparative risks of use and nonuse might be subordinated to an overriding public interest in mass inoculation. (See Franklin & Mais, *supra,* 65 Cal.L.Rev. 754, 764-768 [describing the "tension" between public health goals and tort principles protecting individual choice]; Comment, *supra,* 65 Cal.L.Rev. 1286, 1302, 1310, 1314; Comment, *supra,* 29 Vand.L.Rev. 235, 250, 259; Boffey, *supra,* 196 Science 35, 36.)

ability of certain special products that fall within the unavoidably dangerous products exemption from strict liability design defect analysis. Whether this burden has been properly allocated, however, is ultimately a question for the Legislature. Indeed, we see substantial merit in the view that because vaccination programs such as the one in this case benefit all of society and are sponsored—and often compelled—by the government, the government should indemnify those unfortunate few who become injured.[22] We determine today what the law currently is, not what it should be.

In summary, the trial court erred in allowing plaintiff to present a strict products liability design defect case without first taking evidence to determine whether OPV is an unavoidably dangerous product and thus exempt from strict product liability design defect analysis. Nor, as we have explained, can the general verdict here rest on plaintiff's warning theory; as a matter of law, the warning was adequate under the circumstances.

The judgment is reversed and the case is remanded for proceedings consistent with this opinion. Because we reach this result, we need not consider the remaining issues raised by defendant.

Poché, Acting P. J., and Channell, J., concurred.

A petition for a rehearing was denied October 21, 1985.

---

[22]See *Feldman* v. *Lederle Laboratories, supra,* 460 A.2d 203, 209-210; Franklin & Mais, *supra,* 65 Cal.L.Rev. 754, 772-774; Note, *supra,* 48 Fordham L.Rev. at pp. 759-763; Baynes, *supra,* 21 St. Louis U.L.J. at pp. 70-74; Note, *Strict Liability for Drug Manufacturers: Public Policy Misconceived* (1961) 13 Stan.L.Rev. 645, 651-652; Tarr, *DTP Vaccine Injuries: Who Should Pay?* (Apr. 1, 1985) Nat.L.J. 1. See also Health & Safety Code sections 3380-3390 (state program for elimination of communicable diseases, including polio, by mass immunization); *id.,* section 429.35 (providing for reimbursement up to $25,000 for certain "severe adverse reactions" after any immunization required by state law).