**Ilo Marie GRUNDBERG, individually, and Janice Gray, as personal representative of the Estate of Mildred Lucille Coats, deceased, Plaintiffs,**

v.

**The UPJOHN COMPANY, a Delaware corporation, Defendant.**

No. 900573.

Supreme Court of Utah.

May 14, 1991.

Rehearing Denied June 26, 1991.

Gary W. Pendleton, St. George, Earle F. Lasseter, Thomas R. Vuksinick, H. Ross

Workman, Salt Lake City, and C. Neal Pope, Daniel W. Sigelman, Steven W. Saccoccia, Edward H. Kellogg, Atlanta, Ga., for plaintiffs.

Merlin O. Baker, Paul S. Felt, Thomas L. Kay, Steven J. Aeschbacher, Salt Lake City, and Lane D. Bauer, Stephen E. Scheve, Laura D. Stith, Kansas City, Mo., for defendant.

DURHAM, Justice:

This case comes to us pursuant to rule 41 of the Utah Rules of Appellate Procedure as a question certified from the United States District Court for the District of Utah. The issue before us is whether Utah adopts the "unavoidably unsafe products" exception to strict products liability as set forth in comment k to section 402A of the Restatement (Second) of Torts (1965) ("comment k"). This question presents an unanswered issue of law for original disposition by this court.

We hold that a drug approved by the United States Food and Drug Administration ("FDA"), properly prepared, compounded, packaged, and distributed, cannot as a matter of law be "defective" in the absence of proof of inaccurate, incomplete, misleading, or fraudulent information furnished by the manufacturer in connection with FDA approval. We acknowledge that by characterizing all FDA-approved prescription medications as "unavoidably unsafe," we are expanding the literal interpretation of comment k.

The following facts are taken from the federal district court's certification order. Mildred Lucille Coats died at age 83 from gunshot wounds inflicted by her daughter, Ilo Grundberg, on June 19, 1988. Grundberg and Janice Gray, the personal representative of Coat's estate, brought this action, alleging that Grundberg shot her mother as a result of ingesting the drug Halcion, a prescription drug manufactured by defendant Upjohn to treat insomnia.[1]

Plaintiffs allege that Grundberg took a .5 milligram dose of Halcion the day she shot her mother. They allege that this dose was recommended by her physician and was consistent with Upjohn's recommended dosage. Plaintiffs assert that Grundberg shot her mother while in a state of Halcion-induced intoxication, which allegedly included side effects such as depression, psychosis, depersonalization, aggressive assaultive behavior, and homicidal compulsion.

Plaintiffs' complaint states several causes of action, including common law negligence and strict liability. Plaintiffs claim that Upjohn failed to adequately warn about certain adverse side effects of Halcion and that Halcion was defectively designed. The failure-to-warn claim is scheduled for trial. The strict liability claim based on design defect is the subject of Upjohn's pending summary judgment motion, the outcome of which depends on this court's resolution of the certified question.

The parties agree that the Restatement (Second) of Torts section 402A, comment k (1965) and the principles it embodies provide an exemption from strict liability for a claimed design defect in the case of products that are "unavoidably unsafe." In moving for partial summary judgment, Upjohn argued that public policy supporting the research and development of new drugs requires a holding that *all* FDA-approved prescription medications are "unavoidably unsafe products" under comment k and, as such, manufacturers of those drugs would not be liable for a claim based on defective design. Plaintiffs argue that whether a drug is "unavoidably unsafe" must be determined on a case-by-case basis, with a determination in each case of whether the specific drug's benefit exceeded its risk at the time it was distributed. The district court found this to be a controlling question of law and certified it to this court.

Specifically, the issues we address at the request of the federal court are:

1. Does Utah adopt the "unavoidably unsafe products" exception to strict products liability as set forth in comment k to

---

1. Halcion is the trade name of the drug triazolam.

section 402A of the Restatement (Second) of Torts (1965)?

(a) If Utah does adopt comment k, should FDA-approved prescription drugs be deemed as a matter of law to have satisfied the "unavoidably unsafe" prerequisite to the comment k exception, or should that determination be made on a case-by-case basis?

(b) If Utah does adopt comment k, and if it is further determined that its application to FDA-approved prescription drugs ought to be made on a case-by-case basis, is such determination a threshold question for the trial court or a question properly to be presented to the jury?

(c) If it is determined that comment k is to be applied to FDA-approved prescription drugs on a case-by-case basis, is evidence pertaining to adverse side-effects from the drug which are not alleged to have been personally suffered by the plaintiff relevant to the "unavoidably unsafe" determination?

## I.  UTAH LAW ON STRICT LIABILITY

Section 402A of the Restatement (Second) of Torts (1965) addresses the strict liability of sellers of products. This court adopted section 402A, of which comment k is one provision, in *Ernest W. Hahn, Inc. v. Armco Steel Co.*, 601 P.2d 152, 158 (Utah 1979). Since then, we have adhered to section 402A and to at least one of its accompanying comments. *See Mulherin v. Ingersoll–Rand Co.*, 628 P.2d 1301 (Utah 1981) (applying section 402A); *Dowland v. Lyman Products for Shooters*, 642 P.2d 380, 381 n. 2 (Utah 1982) (applying comment g). We have not addressed the application of comment k in the context of prescription drugs or otherwise.[2] Although two Utah statutes address the liability of product and drug manufacturers, they do not directly address the comment k issues. *See* Utah Code Ann. § 78–15–6(3) (1987) (rebuttable presumption that product was not defective if manufactured according to

industry standards), § 78–18–2 (punitive damages unavailable if drug was approved by FDA).

In its entirety, comment k reads:

*k.  Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

Comment k establishes an exception to the strict products liability section 402A

---

2.  In *Barson v. E.R. Squibb & Sons, Inc.*, 682 P.2d 832 (Utah 1984), this court considered a drug products liability case. We found it unnecessary, however, to reach the strict liability issue,

because we found that there was sufficient evidence to support the jury's finding on the negligence claim. *Id.* at 837.

imposes on "[o]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his [or her] property...." § 402A(1). This liability applies whether or not "the seller has exercised all possible care in the preparation and sale of his product...." § 402A(2)(a). Comment g defines a "defective condition" as a condition "not contemplated by the ultimate consumer which will be unreasonably dangerous to [that consumer]." Comment k, however, defines a category of "unavoidably unsafe" products that "when properly prepared, and accompanied by proper directions and warning, [are] not defective, nor ... *unreasonably* dangerous." (Emphasis in original.)

■ We agree with comment k's basic proposition—that there are some products that have dangers associated with their use even though they are used as intended. We also agree that the seller of such products, when the products are properly prepared and marketed and distributed with appropriate warnings, should not be held strictly liable for the "unfortunate consequences" attending their use. Thus, we adopt comment k's basic policy as the law to be applied in this state and must now turn to the issue of how to apply that policy.

## II. APPLICATION OF COMMENT K

■ As a condition to its application, comment k requires that the product be "properly prepared, and accompanied by proper directions and warning...." There are three types of product defects: manufacturing flaws, design defects, and inadequate warnings regarding use. *See* Pros-

ser & Keeton, *The Law of Torts* § 99, at 695–98 (5th ed. 1984); *Savina v. Sterling Drug, Inc.*, 247 Kan. 105, 795 P.2d 915, 923 (1990). By its terms, comment k excepts unavoidably unsafe products from strict liability only to the extent that the plaintiff alleges a design defect; comment k's immunity from strict liability does not extend to strict liability claims based on a manufacturing flaw or an inadequate warning. The purpose of comment k is to protect from strict liability products that cannot be designed more safely. If, however, such products are mismanufactured or unaccompanied by adequate warnings, the seller may be liable even if the plaintiff cannot establish the seller's negligence. *Toner v. Lederle Laboratories*, 112 Idaho 328, 732 P.2d 297, 305 (1987). Both parties agree in this case that the prerequisite to a comment k exemption—that the drug "was properly prepared and accompanied by warnings of its dangerous propensities"—must be established on a case-by-case basis. This limitation on the scope of comment k immunity is universally recognized.[3]

■ Even in the case of a clearly alleged design defect, however, comment k is unclear on the scope of its protection.[4] Until recently, most courts refrained from applying a design defect theory to products liability cases involving prescription drugs. Beginning with *Brochu v. Ortho Pharmaceutical Corp.*, 642 F.2d 652 (1st Cir.1981), however, and more recently in *Savina v. Sterling Drug, Inc.*, 247 Kan. 105, 795 P.2d 915 (1990), some states have permitted recovery for a strict liability claim based on the theory that the drug was defectively designed.

3. *See Savina,* 795 P.2d at 924; *Castrignano v. E.R. Squibb & Sons, Inc.,* 546 A.2d 775, 780 (R.I.1988); *Brown v. Superior Court,* 44 Cal.3d 1049, 245 Cal.Rptr. 412, 751 P.2d 470, 481 (1988); *Toner,* 732 P.2d at 305; *Feldman v. Lederle Laboratories,* 189 N.J.Super. 424, 460 A.2d 203 (1983), *rev'd on other grounds,* 97 N.J. 429, 479 A.2d 374 (1984); *Brochu v. Ortho Pharmaceutical Corp.,* 642 F.2d 652, 657 (1st Cir. 1981); *Reyes v. Wyeth Laboratories,* 498 F.2d 1264, 1276 (5th Cir.), *cert. denied,* 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974); *Davis v. Wyeth Laboratories, Inc.,* 399 F.2d 121, 128–29 (9th Cir.1968); *Yarrow v. Sterling Drug, Inc.,*

263 F.Supp. 159, 163 (D.S.D.1967), *aff'd,* 408 F.2d 978 (8th Cir.1969); V Schwartz, *Unavoidably Unsafe Products: Clarifying the Meaning and Policy Behind Comment k,* 42 Wash. & Lee L.Rev. 1139, 1141 (1985); S. Willig, *The Comment k Character: A Conceptual Barrier to Strict Liability,* 29 Mercer L.Rev. 545, 546–47 (1978).

4. For a collection of cases discussing whether products, including drugs, are unavoidably unsafe, see Annotation, *Products Liability: What is an "Unavoidably Unsafe" Product,* 70 A.L.R.4th 16 (1989 & Supp.1990).

Some courts have applied comment k on a case-by-case basis, conditioning application of the exemption on a finding that the drug is in fact "unavoidably unsafe." *See Savina*, 795 P.2d 915; *Toner*, 732 P.2d 297; *see also Feldman v. Lederle Laboratories*, 97 N.J. 429, 479 A.2d 374, 382–83 (1984) (involving allegations of failure to warn, but stating, "Whether a drug is unavoidably unsafe should be decided on a case-by-case basis ...."); *Collins v. Eli Lilly Co.*, 116 Wis.2d 166, 342 N.W.2d 37, 52 (1984) (comment k applicable only if drug in question was placed on market without adequate testing because of exigent circumstances); *Patten v. Lederle Laboratories*, 676 F.Supp. 233 (D.Utah 1987) (federal district court predicting that Utah would adopt comment k).

California was the first state to fashion a risk/benefit test to determine which drugs are entitled to comment k protection. In *Kearl v. Lederle Laboratories*, 172 Cal. App.3d 812, 218 Cal.Rptr. 453 (1985),[5] the California Court of Appeal specifically discussed the problems society would face by subjecting drugs to the same accountability as other products, allowing unlimited redress for plaintiffs injured by pharmaceutical products. Such problems, the court noted, include delayed availability of needed drugs and imposition of the costs of research, development, and marketing of new products beyond that which manufacturers, especially small manufacturers, might be willing to risk. 218 Cal.Rptr. at 459 (quoting *Feldman*, 460 A.2d at 209).

The *Kearl* court expressed discomfort, however, with the "mechanical" method by which many appellate courts had concluded that drugs are entitled to special treatment. 218 Cal.Rptr. at 463. Thus, *Kearl* set forth a risk/benefit analysis to be carried out by

the trial court on a case-by-case basis. *Id.* at 463–64. Under this approach, a product may be deemed unavoidably unsafe and thus exempt from a strict liability design defect cause of action only if the court concludes that (1) the product was intended to provide an exceptionally important benefit, and (2) the risk posed was substantial and unavoidable when distributed. *Id.* at 464.[6]

Idaho adopted and to some extent refined the *Kearl* approach in *Toner v. Lederle Laboratories*, 112 Idaho 328, 732 P.2d 297 (1987), a case addressing a suit against the manufacturer of a vaccine to immunize against diphtheria, pertussis, and tetanus ("DPT"). *Toner* required the drug manufacturer to prove at trial, on a case-by-case basis, that the benefits of the drug outweighed the risks at the time of marketing. 732 P.2d at 305–09. To qualify as an "unavoidably unsafe product" under this approach, "there must be, at the time of the subject products' distribution, no feasible alternative design which on balance accomplishes the subject product's purpose with a lesser risk." *Id.* at 306 (citing *Belle Bonfils Memorial Blood Bank v. Hansen*, 665 P.2d 118, 123 (Colo.1983)); *Kearl*, 218 Cal.Rptr. at 464. If there were alternative drug product designs that could have effectively achieved the same purpose, the court reasoned, the risk would not be "unavoidable" or "apparently reasonable" and the marketing and use of the product would not be justified. *Toner*, 732 P.2d at 306.

In direct contrast to those courts applying comment k's immunity on a case-by-case basis are courts holding that all prescription drugs are entitled as a matter of law to the exemption from strict liability claims based on design defect. In *Brown v. Superior Court*, 44 Cal.3d 1049, 245

---

**5.** *Kearl* was overturned by the California Supreme Court in *Brown*, 751 P.2d at 470. Since *Brown*, the rule in California is that all prescription drugs are entitled as a matter of law to an exemption from strict liability claims based upon design defects.

**6.** The trial court would decide whether to exempt a product only after first taking evidence out of the jury's presence, considering:

(1) whether, when distributed, the product was intended to confer an exceptionally important benefit that made its availability highly desirable; (2) whether the then-existing risk posed by the product both was "substantial" and "unavoidable;" and (3) whether the interest in availability (again measured as of the time of distribution) outweighs the interest in promoting enhanced accountability through strict liability design defect review. *Kearl*, 218 Cal.Rptr. at 464.

Cal.Rptr. 412, 751 P.2d 470 (1988), the court addressed claims brought by plaintiffs who sued drug companies for injuries allegedly arising from their mothers' in utero exposure to diethystilbestrol, a synthetic hormone marketed for use during pregnancy. The court weighed the problem of whether imposing strict liability on drug manufacturers comports with the traditional goals of tort law, namely, deterrence and cost distribution. 751 P.2d at 478. The court acknowledged that a drug might be safer if pharmaceutical companies withheld it from the market until scientific skill and knowledge advanced to the point where all dangerous side effects could be discovered. *Id.* at 479. There was concern, however, that this delay, when added to the delay normally required for the FDA to approve a new drug, would not serve the public welfare. The court cited examples of several potentially useful drugs being withdrawn from the market or their availability seriously curtailed because of the liability crisis. *Id.* at 479–80.

The *Brown* court acknowledged the appeal of the *Kearl* cost/benefit approach, yet found the "mini-trial" procedure unworkable because of its negative impact on the development and marketing of new drugs. *Brown*, 751 P.2d at 481. Another of the *Brown* court's objections to *Kearl* was that it left the trial court to hear and resolve mixed questions of law and fact, placing the trial court in the role of fact finder. *Brown*, 751 P.2d at 481–82. The court found the cost/benefit test too open-ended and predicted that it would lead to disparate treatment of the same drug by different judges. *Id.* at 482.

The *Brown* court stressed three public policies mitigating against imposing strict liability for prescription drugs. First, drug manufacturers might stop producing valuable drugs because of lost profits resulting from lawsuits or the inability to secure adequate insurance. *Id.* at 479–80. Second, consumers have a vested interest in prompt availability of new pharmaceutical products. Imposing strict liability for design defects might cause manufacturers to delay placing new products on the market, even after those products receive FDA ap-

proval. *Id.* at 479. Finally, the added expense of insuring against strict liability and additional research programs might cause the cost of medication to increase to the extent that it would no longer be affordable to consumers. *Id.*

The plaintiffs and amici curiae in *Brown* asserted that the language of comment k cannot be interpreted to grant blanket immunity from strict liability to all prescription drugs. Rather, they asserted that only those drugs that are "unavoidably dangerous" are eligible for such protection. *Id.* at 482 n. 11. The court, although conceding that the comment is not entirely clear on this point, noted that "the comment was *intended* to and should apply to all prescription drugs." *Id.* (emphasis added). *Brown* concluded that "because of the public interest in the development, availability, and reasonable price of drugs, the appropriate test for determining responsibility is the test stated in comment k...." *Id.* at 477.

In *Castrignano v. E.R. Squibb & Sons, Inc.*, 546 A.2d 775 (R.I.1988), the Rhode Island Supreme Court had the opportunity to review *Toner* 's case-by-case risk/benefit analysis and *Brown* 's broad exemption approach when formulating its own approach to drug products liability. The Rhode Island court opted for the more restrictive case-by-case approach, *id.* at 781, and developed a directed verdict standard to balance the roles of the judge and the jury in applying comment k. *Id.* at 781–82. Under the *Castrignano* test, if at the time of marketing the apparent benefit outweighed the apparent risk, comment k applies and recovery for design defect is precluded. *Id.* If a trial judge concludes that reasonable minds could not differ in deciding that a drug's benefit exceeds its risk, then as a matter of law, the trial judge can extend comment k protection. *Id.* at 782. If the judge feels that reasonable minds could differ on the question, the judge must submit the issue to the jury. *Id.*

In reviewing the approaches of other jurisdictions toward strict products liability for design defects in drug products, we are troubled by the lack of uniformity and cer-

tainty inherent in the case-by-case approach and fear the resulting disincentive for pharmaceutical manufacturers to develop new products. *Toner*'s attempt to clarify the "unreasonably dangerous" standard seriously curtails the defendants' chances of success in establishing comment k immunity as a matter of law. One commentator notes that a defendant would have an easier time rebutting a plaintiff's prima facie case of design defect under the traditional standard than meeting the tough burden of "earning" the comment k exemption. *See* Reilly, *The Erosion of Comment k*, 14 U. Dayton L.Rev. 255, 266 (1989).

*Toner* applied a very literal and restrictive interpretation of comment k. For example, the comment cites examples of *certain* drugs and vaccines as products that "supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk." Based on this language, *Toner* opined that (1) comment k "[c]learly ... contemplates a weighing of the benefit of the product against its risk" and (2) was never intended to exempt *all* drugs from strict liability. *Toner*, 732 P.2d 297, 306. Even if we agree with the court in *Toner* that the comment contemplates a "weighing" of the drug's risks and benefits, we find it unnecessary to conclude that a *court* is the proper body to engage in that weighing process. Furthermore, we need not be bound by the specific language of comment k and may adopt and apply its fundamental policy without restricting ourselves to what we perceive to be its literal interpretation.

*Castrignano*'s somewhat nebulous standard, designed to control when the question of comment k's application reaches the jury, leaves a great deal of room for plaintiffs to manuever cases to the jury. Additionally, like the traditional case-by-case approach, this standard ignores the effectiveness of the FDA's regulatory process.

We agree with *Brown* that the case-by-case method first articulated in *Kearl* is unworkable, even in light of *Toner*'s refinement of the test. We find the *Brown* result more in line with the public policy considerations in the important area of pharmaceutical product design. We do not agree, however, with the *Brown* court's apparent attempt to use the plain language of comment k as the vehicle for exempting all prescription drugs from strict liability rather than relying on the policies underlying that comment.

The American Law Institute's restatements are drafted by legal scholars who attempt to summarize the state of the law in a given area, predict how the law is changing, and suggest the direction the law should take. The restatement serves an appropriate advisory role to courts in approaching unsettled areas of law. We emphasize, however, that section 402A of the Restatement (Second) of Torts, as drafted in 1965, is not binding on our decision in this case except insofar as we explicitly adopt its various doctrinal principles. We agree with the principle comment k embodies, that manufacturers of unavoidably dangerous products should not be liable for a claim of design defect. We are persuaded that all prescription drugs should be classified as unavoidably dangerous in design because of their unique nature and value, the elaborate regulatory system overseen by the FDA, the difficulties of relying on individual lawsuits as a forum in which to review a prescription drug's design, and the significant public policy considerations noted in *Brown*. We therefore reach the same conclusion as did the California Supreme Court in *Brown*, albeit pursuant to a slightly different rationale.

## III.  UNIQUE CHARACTERISTICS OF DRUGS

Because prescription drugs are chemical compounds designed to interact with the chemical and physiological processes of the human body, they will almost always pose some risk of side effects in certain individuals. Despite these risks, new drugs are continually approved by the FDA because of their social benefit in saving lives and alleviating human suffering. The health care system and general standard of living in this country, for example, would be seriously impaired without such essential drug

products as antibiotics that allow quick recovery from ailments that were once debilitating or even fatal. *See* 37 Food, Drug & Cosmetic L.J. 15 (1982).

In addition, because the expansion of tort liability is justified primarily on the basis of deterring or transferring the cost of injuries, it is appropriate to consider the increased costs that could result from the curtailment of the production of prescription drugs. One commentator notes:

> [D]rugs are our most cost-effective input in supplying the demand for health. *A ten-dollar prescription is frequently a substitute for $2,000 worth of hospital services*—a substitute that produces a positive outcome with much higher frequency than hospital care.... *If we are serious about minimizing costs, our best bet is to increase the number of drug innovations.*

Brozen, *Statements*, Drugs & Health: Economic Issues and Policy Objectives, 305 (Helms ed. 1981) (emphasis added).

Despite inherent risks, *and in contrast to any other product*, society has determined that prescription medications provide a unique benefit and so should be available to physicians with appropriate warnings and guidance as to use. The federal government has established an elaborate regulatory system, overseen by the FDA, to control the approval and distribution of these drugs. *See* 21 U.S.C. §§ 301–393. No other class of products is subject to such special restrictions or protections in our society.

### IV. FDA REGULATION

Congress created the FDA to "protect consumers from dangerous products." *United States v. Sullivan*, 332 U.S. 689, 696, 68 S.Ct. 331, 335, 92 L.Ed. 297 (1948). In its role as "both a health promoter ... and ... a public protector," the FDA employs a comprehensive scheme of premarket screening and post-market surveillance to ensure the safety and efficacy of all licensed medications. 50 Fed.Reg. 7452 (1985).

Before licensing a new medication, the FDA employs an extensive screening mechanism to ensure that the potential benefits of the product outweigh any associated risks. The manufacturer initiates the review by submitting an Investigational New Drug Application ("IND"), containing information about the drug's chemistry, manufacturing, pharmacology, and toxicology. *See* 21 U.S.C. § 355(b)(1) (Supp.1991); 21 C.F.R. § 312.21 (1990). If the FDA approves the IND, the drug's sponsor may gather data on clinical safety and efficacy needed for a New Drug Application ("NDA"), the formal license application. The NDA must include very detailed reports of all animal studies and clinical testing performed with the drug, reports of any adverse reactions, and any other pertinent information from world-wide scientific literature. 21 U.S.C. § 355(b) (Supp.1991); 21 C.F.R. § 314.50 (1990).

The new drug approval process can require years of testing and review. By the time an NDA is submitted, it often consists of thousands of pages of material describing studies of the drug in several hundred to several thousand patients. *See* 47 Fed. Reg. 46626 (Oct. 19, 1982). The FDA carefully scrutinizes the data supporting the NDA, requiring "substantial evidence" consisting of adequate and well-controlled investigations. 21 U.S.C. § 355(d) (Supp. 1991). The application is reviewed by physicians, pharmacologists, chemists, microbiologists, statisticians, and other professionals within the FDA's National Center for Drugs and Biologics who are experienced in evaluating new drugs. 47 Fed. Reg. 46626 (Oct. 19, 1982). Recommendations by those professionals are then reviewed by management personnel within the National Center for Drugs and Biologics before the FDA makes a final determination to approve or reject the new drug application. *Id.*

Elaborate premarket screening, however, does not ensure review of approved prescription medications where adverse reactions may appear after extensive preapproval testing. For this reason, the FDA also conducts extensive post-market surveillance. *All* reports of adverse drug reactions ("ADRs") must be reported to the

FDA, regardless of whether the physician, the manufacturer, or others believe the reaction to be drug-related. 21 C.F.R. § 314.80(b). The manufacturer must also periodically submit reports as to what actions it took in response to ADRs and must submit data from any post-marketing studies, reports in the scientific literature, and foreign marketing experience. 21 C.F.R. §§ 314.80(b), .80(c). The FDA has authority to enforce these reporting requirements; any failure to comply may subject a manufacturer to civil and criminal penalties. 21 U.S.C. §§ 332–34 (1972 & Supp.1991). In response to its surveillance findings, the FDA may require labeling changes or if necessary withdraw NDA approval and thereby revoke the license to market the medication. *Id.* at § 355(e).

We find this extensive regulatory scheme capable of and appropriate for making the preliminary determination regarding whether a prescription drug's benefits outweigh its risks. The structured follow-up program imposed by law ensures that drugs are not placed on the market without continued monitoring for adverse consequences that would render the FDA's initial risk/benefit analysis invalid. Allowing individual courts and/or juries to continually reevaluate a drug's risks and benefits ignores the processes of this expert regulatory body and the other avenues of recovery available to plaintiffs.

We note that the Utah Legislature has recognized the value of the FDA approval process and the public interest in the availability and affordability of prescription drugs by restricting the extent of liability for injuries resulting from the use of those drugs. Utah Code Ann. § 78–18–2(1) (Supp.1990) states that "punitive damages may not be awarded if a drug causing the claimant's harm: (a) received premarket approval or licensure by the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. Section 301 et seq...." This policy, designed to avoid discouraging manufacturers from marketing FDA-approved drugs, applies even to drugs marketed with inadequate warnings.

█ The legislature has also acknowledged the important role of governmental standards in Utah Code Ann. section 78–15–6(3).[7] In that section, the legislature declared that there is a rebuttable presumption that a product which fully complies with the applicable government standards at the time of marketing is not defective.[8]

Our prior case law supports this approach as well. In *Barson v. E.R. Squibb & Sons, Inc.*, 682 P.2d 832 (Utah 1984), we addressed the sufficiency of evidence for a claim that a drug manufacturer negligently failed to warn of risks associated with its product. We held that even after meeting governmental requirements, if there are dangers about which the drug manufacturer knew or should have known, the manufacturer may be subject to liability. *Id.* at 836. Thus, consistent with our holding in this case, if a manufacturer knows or should know of a risk associated with its product, it is directly liable to the patient if it fails to adequately warn the medical profession of that danger. *Id.* at 835.

---

7. Section 3 of the Utah Products Liability Act, Utah Code Ann. §§ 78–15–1 to –6, was held unconstitutional by this court in *Berry v. Beech Aircraft Corp.*, 717 P.2d 670 (Utah 1985), as a statute of repose. Because section 78–15–3 was not severable from the other sections of the Act, we ruled that the remainder of the Products Liability Act was invalid. The legislature repealed and amended certain sections in an apparent effort to comply with the court's concerns. Although section 78–15–6 was neither repealed, amended, nor specifically reenacted, there is no indication that the legislature has changed its policy regarding deference to governmental standards.

8. Plaintiffs argue that immunizing drug manufacturers from strict liability for design defects is contrary to this statute, because that conclusion would establish an "irrebuttable presumption" that the drug was not defective or unreasonably dangerous. We disagree. Plaintiffs may still recover under a strict liability claim by demonstrating that the product was unreasonably dangerous due to an inadequate warning, a manufacturing flaw, mismarketing, or misrepresenting information to the FDA. We cite these statutes only to demonstrate the legislature's similar deference to the expertise of certain governmental agencies, particularly that of the FDA.

Moreover, the standard in Utah to which drug manufacturers must adhere to establish an adequate warning is very strict. In *Barson*, we stated:

In determining whether a manufacturer has breached that duty [to adequately warn] and the extent to which a manufacturer is required to know of dangers inherent in its drug, it is important to point out that *the drug manufacturer is held to be an expert in its particular field and is under a "continuous duty . . . to keep abreast of scientific developments touching upon the manufacturer's product* and notify the medical profession of any additional side effects discovered from its use." *The drug manufacturer is responsible* therefore for not only "actual knowledge gained from research and adverse reaction reports," but also *for constructive knowledge as measured by scientific literature and other available means of communication.*

*Barson*, 682 P.2d at 835–36 (emphasis added).

## V. PROPER FORUM FOR RISK/BENEFIT ANALYSIS

Finally, we do not believe that a trial court in the context of a products liability action is the proper forum to determine whether, as a whole, a particular prescription drug's benefits outweighed its risks at the time of distribution. In a case-by-case analysis, one court or jury's determination that a particular drug is or is not "defectively designed" has no bearing on any future case. As a result, differences of opinion among courts in differing jurisdictions leaves unsettled a drug manufacturer's liability for any given drug. Although the FDA may have internal differences of opinion regarding whether a particular new drug application should be approved, the individuals making the ultimate judgment will have the benefit of years of experience in reviewing such products, scientific expertise in the area, and access to the volumes of data they can compel manufacturers to produce. Nor is the FDA subject to the inherent limitations of the trial process, such as the rules of evidence, restrictions on expert testimony, and scheduling demands.[9]

One commentator has argued that courts as a whole are unsuited to render responsible judgments in the design defect area generally. *See* Henderson, *Judicial Review of Manufacturers' Conscious Design Choices: The Limits of Adjudication*, 73 Colum.L.Rev. 1531 (1973). He argues that decisions in this area are arbitrary due to their "polycentric" nature in which "each point for decision is related to all the others as are the strands of a spider web." *Id.* at 1536. These issues are difficult to litigate because

[i]f one strand is pulled, a complex pattern of readjustments will occur throughout the entire web. If another strand is pulled, the relationships among all the strands will again be readjusted. A lawyer seeking to base [an] argument upon established principle and required to address himself in discourse to each of a dozen strands, or issues, would find [the] task frustratingly impossible.

*Id.*

Although we do not accept the notion that courts are unsuited to address design defect claims in any products liability action, we do agree that prescription drug design presents precisely this type of "polycentric" problem. A drug is designed to be effectively administered to specific indi-

---

**9.** There is also a certain moral question to be addressed when determining whether a product's benefit outweighs its risk when faced with the reality of an injured plaintiff. For example, in the case of a vaccine, certain benefits of the drug's availability will accrue to group A, the individuals who are prevented from contracting the disease. A smaller number of individuals, however, may contract the disease and react violently to a component of the drug or, as some other result of the drug's properties, suffer terribly. Under a case-by-case approach, courts or juries must ask which is a more significant interest: efficacy with respect to group A versus harm to group B? The FDA must ask the same question: Does the benefit of this product outweigh its risk? The distinction is that the FDA is in a more objective and informed posture to make that determination. *See Toner*, 732 P.2d at 325–26 (appendix B: transcript excerpt of Malcolm E. Wheeler's oral argument).

viduals for one or a number of indications. To determine whether a drug's benefit outweighs its risk is inherently complex because of the manufacturer's conscious design choices regarding the numerous chemical properties of the product and their relationship to the vast physiologic idiosyncracies of each consumer for whom the drug is designed. Society has recognized this complexity and in response has reposed regulatory authority in the FDA. Relying on the FDA's screening and surveillance standards enables courts to find liability under circumstances of inadequate warning, mismanufacture, improper marketing, or misinforming the FDA—avenues for which courts are better suited. Although this approach denies plaintiffs one potential theory on which to rely in a drug products liability action, the benefits to society in promoting the development, availability, and reasonable price of drugs justifies this conclusion.

In light of the strong public interest in the availability and affordability of prescription medications, the extensive regulatory system of the FDA, and the avenues of recovery still available to plaintiffs by claiming inadequate warning, mismanufacture, improper marketing, or misrepresenting information to the FDA, we conclude that a broad grant of immunity from strict liability claims based on design defects should be extended to FDA-approved prescription drugs in Utah.[10]

HALL, C.J., and ZIMMERMAN, J., concur.

HOWE, Associate Chief Justice: (dissenting).

I dissent. I would limit the comment k exception to its literal wording as advocated by Justice Stewart. I would apply it only to a narrow class of prescription drugs which have lifesaving potential, drugs which have attendant risks but which are administered because they have the potential of saving the life of a person who is probably doomed to death by a disease, an

epidemic, or a fatal condition. I believe that is what is meant by "unavoidably" unsafe. The exception would thus apply only to a small number of drugs—not the full gambit of drugs approved by the FDA. While I recognize the problem associated with a case-by-case application, I do not think the problem would be as great as portrayed by the majority opinion since only a relatively small number of drugs would fall into the class entitled to the exemption.

The Supreme Court of Wisconsin in *Collins v. Eli Lilly Co.*, 116 Wis.2d 166, 342 N.W.2d 37 (1984), adopted a narrow application of comment k:

> Drug companies like other sellers or manufacturers, have a duty to produce and market reasonably safe products. We recognize in some exigent circumstances it may be necessary to place a drug on the market before adequate testing may be done. Insofar as these circumstances exist, we agree with the comment [k] that strict liability should not be imposed. However, we find no exigent circumstances which would excuse DES producers or marketers from adequately testing DES before it was placed on the market. Although there was a societal interest in preventing miscarriages in pregnancy, alternative treatment was available and the problem did not approach epidemic proportions.

A similar view was expressed by United States District Judge J. Thomas Greene in *Patten v. Lederle Laboratories*, 676 F.Supp. 233 (D.C.Utah 1987), where he wrote:

> [A]s this court sees it, comment k does not provide blanket immunity to *all* prescription drugs. The language of the comment indicates it is to apply to only 'some' products.... The court considers that extending comment k protection to an entire class of products would be unwise in light of the requirements comment k specifies as prerequisite to its application.

10. Because of our response to the first two certified questions, we need not reach the other issues presented.

As to all prescription drugs which do not fall within the exempted class but which have been approved by the FDA, I would accord them only a rebuttable presumption of being of safe design.

STEWART, Justice (dissenting):

I dissent. The majority holds that a drug that is *avoidably* unsafe to human life or health is exempt from strict liability for design defects if approved by the FDA, even though alternative drugs can provide the same, or even better, therapy, with less risk to life or health. Thus, such FDA-approved drugs as various decongestants, expectorants, deodorants, hair growth stimulants, skin moisturizers, and cough and cold remedies,[1] for example, have the same immunity as rabies or polio vaccines or medications essential in the treatment of cancer, heart disease, or AIDS. I see no basis for according drugs used to treat comparatively minor ailments a blanket immunity from strict liability for design defects if they are unreasonably dangerous to those who use them.

The limited immunity conferred by comment k on a few drugs was given only after thorough consideration by the American Law Institute. However, this Court gives blanket immunity for design defects to all FDA-approved drugs on the basis of blind reliance upon the efficacy and integrity of FDA procedures, about which the majority knows almost nothing. I agree with Justice Huntley of the Idaho Supreme Court, who stated:

[N]o state supreme court has yet become convinced that the FDA has either adequate staffing, expertise, or data base to warrant its being substituted for the judicial system.

. . . .

I fear the day when any supreme court can be convinced that an agency such as the FDA, no matter how well-intentioned, can supplant the American judicial system.

*Toner v. Lederle Laboratories,* 112 Idaho 328, 732 P.2d 297, 313 (1987) (Huntley, J., concurring specially). Indeed, in relying on FDA approval, the majority wholly ignores our statement in *Barson v. E.R. Squibb & Sons, Inc.,* 682 P.2d 832, 836 (Utah 1984), that FDA regulations for prescription drugs "are merely minimum standards."

In truth, FDA safety procedures do not justify abdication of judicial responsibility. For example, the FDA does not require existing drugs to undergo newly developed tests which would increase the likelihood that a product is in fact safe. This was illustrated in *Barson,* 682 P.2d at 836, in which this Court stated:

Since 1962, the Food and Drug Administration (FDA) has required teratogenicity testing on all new drugs. In 1966, the FDA established guidelines regarding teratogenicity testing. Since Delalutin was not a "new" drug as defined by the guidelines, there was no federal requirement that Squibb test Delalutin for teratogenicity; testimony indicated that Squibb had never done so.

Numerous congressional investigations have demonstrated that the FDA has often approved drugs in complete ignorance of critical information relating to the hazards of such drugs which was contained either in its own files or in the published medical literature, or both. For example, the FDA approved Oraflex on April 19, 1982, for the treatment of arthritis. The manufacturer withdrew the drug from the market on August 4, 1982, because eleven deaths were reported to be associated with the drug's use in the United States and sixty-one deaths were reported in the United Kingdom. Of principal concern were reports of serious and sometimes fatal Oraflex-associated liver and kidney disease. In *Deficiencies in FDA's Regulation of the New Drug "Oraflex",* H.R.Rep. No. 511, 98th Cong., 1st Sess. (1983), the House Committee on Government Operations (hereinafter "H.C.G.O."), a congressional committee overseeing the FDA, found that the FDA was unaware that during the Ora-

---

**1.** *The Physicians' Desk Reference* (1990 ed.) includes prescription drugs in each of the catego- ries stated in the text.

flex clinical trials it had received four reports of serious concomitant liver and kidney disease and two reports of kidney disease unaccompanied by liver injury.[2] At the time the FDA approved Oraflex for marketing, and for several months thereafter, it was unaware of the number of reports of Oraflex-associated adverse reactions it had received prior to its approval of the drug. *Id.* at 11–12. Prior to approving Oraflex, the FDA made no effort to obtain information on its safety from foreign countries in which the drug had already been marketed and was, therefore, unaware of a large number of reports of serious and sometimes fatal reactions to the drug submitted to the British and Danish regulatory authorities. *Id.* at 13. The FDA failed to enforce the legal requirement that drug manufacturers report all adverse reactions to a drug under clinical investigation, information essential to weigh the drug's risks against its potential benefits. *Id.* at 22.

The FDA approved Merital for the treatment of depression on December 31, 1984. Merital was withdrawn from the market in January 1986 because of a large number of reports of serious immune-allergic or hypersensitivity reactions, including several fatalities, associated with its use. In the report *FDA's Regulation of the New Drug Merital*, H.R.Rep. No. 206, 100th Cong., 1st Sess. (1987), the H.C.G.O. found that prior to approving Merital, the FDA overlooked clinical evidence it had received of the drug's allergy-inducing potential. *Id.* at 24. The FDA's enforcement of its adverse reaction reporting requirements was inadequate. *Id.* at 71. H.C.G.O. concluded that the FDA had exposed the American public to the potential hazards of Merital without requiring that the drug's efficacy be supported by substantial evidence derived from adequate and well-controlled studies. *Id.* at 80.

The FDA approved Versed for preoperative sedation, induction of general anesthesia, and conscious sedation for short diagnostic or endoscopic procedures on December 20, 1985. Thereafter, Versed was associated with numerous reports of life-threatening and, in many instances, fatal episodes of cardiac and respiratory arrest, particularly when used for conscious sedation. The FDA concluded that these reactions were dose-related, but not until November 1987 were the recommended conscious sedation doses for Versed substantially reduced. The H.C.G.O. found that the Versed doses originally approved for conscious sedation were substantially higher than those shown to be effective. *FDA's Deficient Regulation of the New Drug Versed*, H.R.Rep. No. 1086, 100th Cong., 2nd Sess. at 10 (1988). When it approved Versed for marketing, the FDA was unaware of important studies, despite the fact that they had been published in the medical literature, *id.* at 20, and in many instances, had been submitted to the agency. *Id.* at 21. H.C.G.O. also found that the FDA was unaware of the manner in which Versed was regulated in foreign nations and failed to investigate the adverse reaction reporting practices of the manufacturer of Versed, notwithstanding data the agency had received from the company strongly suggesting that the firm had neglected to submit to the agency reports of Versed-associated deaths known to the company prior to the drug's approval. *Id.* at 25, 37.

The FDA approved Zomax on October 28, 1980, for the relief of mild to moderately severe pain. On March 4, 1983, marketing of the drug was halted by its manufacturer due to a large number of allergic reactions, including deaths, associated with its use. Eventually, more than 2,100 reactions were reported to the FDA. In *FDA's Regulation of Zomax*, H.R.Rep. No. 584, 98th Cong., 1st Sess. (1983), the H.C.G.O. found that the FDA approved Zomax in violation of an agency policy requiring that its benefits be shown to outweigh its demonstrated

---

**2.** As a consequence of its ignorance, the agency approved labeling which stated that Oraflex-associated liver reactions were confined to "liver function test abnormalities" that were "usually transient" and that denied altogether the existence of "evidence ... of renal [kidney] toxicity in [the Oraflex] clinical studies." *Deficiencies in FDA's Regulation of the New Drug "Oraflex"* at 9–10.

carcinogenic risk. *Id.* at 5. The FDA failed to make the risk-benefit analysis this Court has placed within the exclusive province of the FDA. Also, the FDA's monitoring of Zomax-associated adverse reaction reports was deficient. When Zomax was removed from the market, the agency's computerized tracking system showed that the FDA had received only 270 reports of Zomax-associated allergic reactions, whereas the drug's manufacturer had actually submitted 900 reports to the agency. *Id.* at 11–12. The FDA also failed to note evidence in its possession suggesting that Zomax posed a higher risk of serious and sometimes life-threatening allergic reactions than other drugs in its class, particularly among patients with no prior history of drug allergy. *Id.* at 16.[3]

Although the FDA has a mechanism for the withdrawal of pharmaceutical agents which are found to be dangerous, 21 U.S.C. § 355(e) (1988), the mechanism is slow and sometimes unreliable. For example, several studies were published in the early 1950s which should have put diethylstilbestrol (DES) manufacturers on notice that DES injured the reproductive systems of female fetuses whose mothers were exposed to the drug. However, it was not until 1971, nearly twenty years later, that the FDA finally banned the use of DES to prevent miscarriages, the most common use of the drug. *See Castrignano v. E.R. Squibb & Sons, Inc.*, 546 A.2d 775, 777 (R.I.1988). The lengthy wait by the FDA resulted in endangering a generation of women because their mothers had used DES during pregnancy.

In relying on the efficacy of FDA approval procedures as the basis for dispensing with the judicial remedy of product liability, the majority simply ignores FDA failures to protect the public against unnecessary and unacceptable risks. I agree with what the Wisconsin Supreme Court stated in *Collins v. Eli Lilly Co.,* 116 Wis.2d 166, 197, 342 N.W.2d 37, 52, *cert. denied,* 469 U.S. 826, 105 S.Ct. 107, 83 L.Ed.2d 51 (1984):

Drug companies, like other sellers or manufacturers, have a duty to produce and market reasonably safe products. We recognize that in some exigent circumstances it may be necessary to place a drug on the market before adequate testing can be done. Insofar as these circumstances exist, we agree with the comment [k] that strict liability should not be imposed. However, we find no exigent circumstances which would excuse DES producers or marketers from adequately testing DES before it was placed on the market. Although there was a societal interest in preventing miscarriages in pregnancy, alternative treatment was available, and the problem did not approach epidemic proportions. Even assuming there were exigent circumstances in 1947 necessitating the use of DES in pregnancy without adequate testing, an additional ten years had elapsed by the time the plaintiff's mother took DES. Thus, it would appear the drug companies had sufficient time to test DES thoroughly even if the original need to place it on the market foreclosed adequate testing at that time. Accordingly, we hold that DES producers or marketers may be held strictly liable if the plaintiff establishes the five elements specified earlier.

Proposals before Congress and rules promulgated by the FDA to make it easier for pharmaceutical companies to obtain FDA approval for new drugs would dilute even further the safety and efficacy standards for FDA approval of drugs. *See* Note, *Regulation of Investigational New Drugs: "Giant Step for the Sick and Dying?"*, 77 Georgetown L.J. 463 (1988). Perhaps truly unavoidably unsafe drugs intended to treat life-threatening ailments should be more easily available to the public, but a lessening of safety standards is an argument for strict liability, not against. Profit motivation is likely to lead to many more unnecessarily dangerous drugs.

Furthermore, not a shred of evidence has been presented to this Court that indicates that liability under the tort system has

---

**3.** The court in *Toner* noted other FDA failures.    732 P.2d at 311 n. 12.

deterred pharmaceutical companies from introducing new drugs. Even if that were the case, the question that must be answered, given the majority's holding, is why comment k does not provide a proper accommodation of all the competing policy interests involved in the issue before the Court. Why should those who are seriously injured or suffer because of the death of another have to stand the expense of such losses to support the high profit margins in the drug industry?

In my view, the Rhode Island Supreme Court adopted a better approach in *Castrignano v. E.R. Squibb & Sons, Inc.*, 546 A.2d 775 (R.I.1988). The Rhode Island court held that only products that are truly unavoidably unsafe qualify for comment k protection. The court stated:

This comment provides a risk-benefit test for products that, given the present state of human knowledge, are incapable of being made safe for their intended use. Products that satisfy the risk-benefit test are deemed unavoidably unsafe. These products, especially drugs, will not be considered defective and unreasonably dangerous under § 402A because their known or perceived benefits exceed their known or perceived risks. Therefore, the availability and marketing of these products is justified, not withstanding the risk.

The authors of the comment try to demonstrate which types of drugs should be excluded from strict-liability analysis through various examples. The authors state that the comment's exemption should apply to drugs, like the rabies vaccine, whose harmful side effects are known but whose benefits far outweigh the known risks.... The authors also state that this exemption should apply to new and experimental drugs that possess obvious yet undefined dangers because the perceived benefits of the drugs nonetheless justify their marketing. The comment provides that these new drugs should not be held to a standard of strict liability in light of the public policy favoring the availability of such products.

546 A.2d at 781.

Certain drugs clearly qualify for comment k exemption, even though the drugs' risk may be comparatively great. A drug's social utility may be so great, for example, a chemotherapeutic agent used for treatment of cancer, that it would obviously qualify for comment k exemption. Other drugs, such as sleeping compounds or dandruff cures, whose social utility may not be of such a high order, would not automatically qualify. The Rhode Island court stated that for a prescription drug to qualify for comment k exemption,

the apparent benefits of the drug must exceed the apparent risks, given the scientific knowledge available when the drug was marketed. If the benefits outweigh the risks, then recovery for design-defect liability is precluded. If, however, the apparent risks exceed the apparent benefits, then the product is not exempt from design-defect liability and will be subject to the traditional design-defect analysis set forth in § 402A.

546 A.2d at 782.

Furthermore, Congress has never given broad immunity, as this Court does, to all prescription drugs, notwithstanding FDA approval. *See* Note, *A Prescription for Applying Strict Liability: Not all Drugs Deserve Comment k Immunization, Brown v. Superior Court, 44 Cal.3d 1049, 751 P.2d 470, 245 Cal.Rptr. 412 (1988),* 21 Ariz.St.L.J. 809, 830 (1989). Congress has, however, provided some immunity from tort law for some vaccines when the public interest required their widespread use. For example, Congress enacted the National Childhood Vaccine Injury Act, 42 U.S.C. §§ 300aa–1 to –34 (1988), which establishes a compensation scheme for children injured by vaccines as an alternative to pursuing tort claims against the manufacturers. However, even that Act does not completely foreclose strict liability for plaintiffs injured by vaccines; instead, it only establishes presumptions to aid the trier of fact. 42 U.S.C. §§ 300aa–22(b)(2), –23(d)(2).

The majority opinion states that a case-by-case analysis would leave drug companies uncertain regarding questions of immunity and would result in patchwork verdicts when a drug may be found to be subject to comment k exemption in one case but not subject to the exemption in another case. That consideration has little

merit, in my view. We tolerate nonuniformity of result in negligence cases all the time. Nothing this Court does can bring about uniformity of result with respect to drugs. The states are already divided on the issue of whether FDA approval of a drug should confer immunity from design defects, although it appears that no state has gone as far as Utah now does. Suffice to say, a number of courts apply comment k on a case-by-case basis—a task that cannot be avoided even under the majority's position if a strict liability claim is coupled with a negligence claim, as is usually the case.

Significantly, Congress has not shared this Court's professed concern for uniformity. Whatever lack of uniformity there has been in drug cases has been insufficient to justify uniform national products liability legislation. Furthermore, the Legislature of this State thought that a presumption was sufficient protection for manufacturers rather than outright immunity. *See* Utah Code Ann. § 78–15–6(3) (1987). It is indeed ironic that the policy of uniformity weighs more heavily in this Court than in the United States Congress or the Utah Legislature. We can only deal with the law in Utah, and the possibility of patchwork verdicts on a nationwide basis is simply beyond our power to affect. In short, the majority simply deprives Utahns of a judicial remedy for injuries sustained from defectively designed drugs, despite the fact that citizens of other states may recover for those injuries.

In this case, plaintiff Ilo Marie Grundberg was taking a variety of medications for chronic depression and anxiety. Halcion, the medication at issue here, had first been prescribed for Mrs. Grundberg on May 21, 1987.[4] In December 1987, Mrs. Grundberg lost her job and, shortly thereafter, moved with her mother, Mildred Coats, to Hurricane, Utah, where they lived together in a mobile home. On June 19, 1988, Mrs. Grundberg took three medications: Valium, codeine, and Halcion. Later that night, she shot and killed her mother. Mrs. Grundberg was charged with

criminal homicide. Because of alienists' reports, the Washington County prosecutor dropped all criminal charges on February 7, 1989. Mrs. Grundberg and Janice Gray, the personal representative of Mrs. Coats' estate, filed this civil action later in 1989. At issue in this case is whether Halcion was the cause of Mrs. Grundberg's bizarre behavior on the night of the homicide.

If Halcion was a causative agent, it is significant that *The Physicians' Desk Reference* (1990 ed.) lists nine other hypnotic agents available for use. At least two of the other hypnotics and one other medication listed as a sleeping aid are benzodiazepines and are, therefore, of the same general type as Halcion. In addition, the same reference lists thirteen sedatives that are on the market. The majority ignores the fact that the FDA found Halcion to be neither unique nor particularly essential and presented no advancement over existing therapeutic alternatives. Perhaps not all would have been appropriate medications, but with so many possible alternatives, it is doubtful that Halcion should be immune from strict liability.

I also join Justice HOWE's dissent.

---

**4.** Halcion is the trade name for triazolam, a prescription medication used for treatment of insomnia. Triazolam is one of a class of drugs known as benzodiazepines. Halcion, which is manufactured by Upjohn, was approved by the FDA in November 1982.